RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0262p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

KENNETH CHAPMAN, JESSICA VENNEL, JASON JACKSON, and EDWINA PINON, on behalf of themselves and all others similarly situated,

>    *Plaintiffs-Appellees*,

    *v.*

TRISTAR PRODUCTS, INC.,

>    *Defendant-Appellee*,

STATE OF ARIZONA and ARIZONA ATTORNEY GENERAL,

>    *Proposed Intervenors-Appellants*.

Nos. 18-3847/3866

───────────────

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:16-cv-01114—James S. Gwin, District Judge.

Argued:  August 6, 2019

Decided and Filed:  October 10, 2019

Before:  ROGERS, BUSH and LARSEN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Oramel H. (O.H.) Skinner, OFFICE OF THE ARIZONA ATTORNEY GENERAL, Phoenix, Arizona, for Appellants.  Gregory F. Coleman, GREG COLEMAN LAW PC, Knoxville, Tennessee, for Class Appellees.  Stephen R. Robinson, TRISTAR PRODUCTS, INC., Wyomissing, Pennsylvania, for Appellee Tristar.  James Burnham, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Amicus Curiae.  **ON BRIEF:** Oramel H. (O.H.) Skinner, Drew C. Ensign, OFFICE OF THE ARIZONA ATTORNEY GENERAL, Phoenix, Arizona, for Appellants.  Gregory F. Coleman, Adam A. Edwards, Mark E. Silvey, GREG COLEMAN LAW PC, Knoxville, Tennessee, Drew Legando, LANDSKRONER GRIECO MERRIMAN, LLC, Cleveland, Ohio, for Class Appellees.  Stephen

R. Robinson, TRISTAR PRODUCTS, INC., Wyomissing, Pennsylvania, for Appellee Tristar. James Burnham, Kendrack D. Lewis, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Amicus Curiae.  Theodore H. Frank, HAMILTON LINCOLN LAW INSTITUTE, Washington, D.C., for Amicus Curiae.

———————————

**OPINION**

———————————

JOHN K. BUSH, Circuit Judge.  The Arizona Attorney General believes the plaintiff class got a bad deal in settling this products liability lawsuit over allegedly defective pressure cookers.  The settlement agreement, entered after one day of trial, included an award of approximately $2 million in fees and expenses for class counsel, and substantially less than that—primarily in the form of coupons—for the class members.  The Attorney General, on behalf of his office and the State of Arizona (collectively "Arizona"), objected in the district court to the terms of the settlement, arguing that it was lopsided and should be rejected.  Arizona also moved to intervene below.  The district court denied the motion on the ground that Arizona did not have Article III standing to intervene and then approved the settlement.  We agree with the district court that Arizona does not have standing.  Therefore, we **DISMISS** Arizona's appeal for want of jurisdiction.

**I.**

Plaintiffs brought this class action in May 2016, alleging that certain pressure cookers that defendant, Tristar Products, Inc. ("Tristar"), manufactures had defective lids.  Allegedly, the lids could come open while the cookers were in use, which exposed the user to possible injury from the hot, pressurized contents of the cooker spilling out onto the user.  After discovery and motions practice, some of the class claims were dismissed, but most survived.  The district court did not certify a nationwide class, but instead certified three separate state classes for trial: Ohio, Pennsylvania, and Colorado.

After further motions practice, trial began on July 10, 2017.  By the end of the first day of trial, things were not going well for plaintiffs.  According to the district court, "after a significant amount of testimony on the first day of trial, it was not obvious either that a defect existed or that

the defect made Tristar's pressure cookers worthless." R. 156, PageID 3684. During a recess on the first day of trial, both sides agreed to a settlement of the case with a nationwide class. The parties agreed to the principal amount of the settlement but, with Tristar's agreement not to dispute an award at or below $2.5 million, deferred determination of the size of the attorneys' fee award. Although the negotiations successfully concluded after the trial began, discussion had been in the works for several weeks; in fact, the magistrate judge in the case had mediated several negotiation sessions in the weeks leading up to trial.

The agreed-to settlement allowed class members to receive a coupon for purchase of a different Tristar product and a warranty extension, provided they watched a safety video. The district court calculated that the value of the coupons and warranty extensions in the settlement was $1,020,985.[1] The district court also approved an award of attorneys' fees in the amount of $1,980,382.59.

On July 12, the district court held a fairness hearing to determine if the settlement was fair and acceptable. It was not until the fairness hearing that Arizona made its first appearance in the case, arguing as amicus, along with United States Department of Justice ("DOJ") also as amicus, that the settlement was unfair to the plaintiff class. Their objections stemmed from the division of settlement funds between the principal settlement and class counsel attorneys' fees. Arizona and DOJ argued that a fair settlement would see a higher proportion of the funds going to the class members rather than to class counsel. None of the class, however, ever joined in either Arizona or DOJ's objections to the settlement.

Amici's arguments against the settlement did not prevail at the fairness hearing. The district court indicated that it would approve the settlement, albeit with some modifications. Before the court issued its opinion and order on the matter, however, Arizona sought to officially intervene for purposes of appeal under either Rule 24(a) (intervention as of right) or Rule 24(b) (permissive intervention) of the Federal Rules of Civil Procedure. In the alternative, Arizona asked the court to recognize it as an objector to the settlement. The district court rejected each of Arizona's requests for lack of Article III standing. Arizona now appeals, seeking reversal of the

---

[1]Arizona disputes this valuation, arguing that it is too high.

district court's decision on the motion to intervene as well as reversal of the district court's decision to accept the settlement.

## II.

Before we may address Arizona's substantive arguments, we must determine whether Arizona has standing.

We begin with first principles. Our federal Constitution creates a republican government of three co-equal branches, each of which possesses only limited power. The judicial power is particularly limited to cases and controversies before the Supreme Court and such inferior courts as Congress may create. U.S. Const. art. III, §§ 1–2. This jurisdictional limitation requires, among other things, that a party wishing to litigate a dispute before a federal court demonstrate standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992) (explaining that "the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III"). The standing requirement prevents federal courts from issuing advisory opinions. "Article III of the U.S. Constitution does not authorize federal courts to decide theoretical questions." *Hegy v. Demers & Adams*, 882 F.3d 616, 620 (6th Cir. 2018). The prohibition on advisory opinions, in turn, is an important element in the separation of lawful powers between the governmental branches of our republic. "When the federal judicial power is invoked to pass upon the validity of actions by the Legislative and Executive Branches of the Government, the rule against advisory opinions implements the separation of powers prescribed by the Constitution and confines federal courts to the role assigned them by Article III." *Flast v. Cohen*, 392 U.S. 83, 96 (1968).

Although Congress may by statute define the jurisdiction of the federal courts, our jurisdiction can never extend beyond the outer limits set by Article III. "[B]y the express terms of the Constitution, the exercise of the judicial power is limited to 'cases' and 'controversies.' Beyond this it does not extend, and unless it is asserted in a case or controversy within the meaning of the Constitution, the power to exercise it is nowhere conferred." *Muskrat v. United States*, 219 U.S. 346, 356 (1911). The Article III limit on our jurisdiction is important because, if we were to render an advisory opinion, it would be a constitutional violation that is un-

redressable.  Accordingly, we are required in every case to determine—sua sponte if the parties do not raise the issue—whether we are authorized by Article III to adjudicate the dispute.  *See Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011) ("[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press.").  We may not decide the merits of a claim for relief unless some party pressing the claim has standing to bring it.  *See Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650–51 (2017).

Arizona moved to intervene either permissively or as of right under Rule 24. "An intervenor need not have the same standing necessary to initiate a lawsuit in order to intervene in an existing district court suit where the plaintiff has standing," *Associated Builders & Contractors v. Perry*, 16 F.3d 688, 690 (6th Cir. 1994), at least where the intervenor does not "seek[] additional relief beyond that which the plaintiff requests," *Laroe Estates*, 137 S. Ct. at 1651.  But intervenors must establish Article III standing if they wish to *appeal* the outcome of a lawsuit.  We have recognized that "an intervenor, by right or permission, normally has the right to appeal an adverse final judgment by a trial court, just as any other party can.  However, as any other party, an intervenor seeking to appeal must have standing under Article III of the Constitution . . . .  The standing requirement may therefore bar an appeal . . . ." *Perry*, 16 F.3d at 690 (citation omitted).  Thus, before we can consider any argument that Arizona makes concerning this litigation, we must determine whether Arizona has standing to bring this appeal. If it does not, we must dismiss the appeal.

To demonstrate standing a party must show an "injury in fact" that is (1) both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) "fairly traceable to the challenged action of the defendant," and (3) redressable by a favorable decision of the court.  *Lujan*, 504 U.S. at 560–61 (cleaned up).  The party seeking jurisdiction before a federal court bears the burden of showing these elements.  *Id.* at 561; *accord Durham v. Martin*, 905 F.3d 432, 433–34 (6th Cir. 2018).  Here, Arizona was not a party to the litigation but sought to intervene in order to unwind the parties' settlement agreement.  Our inquiry turns on whether Arizona has an "injury in fact" to support standing.

Arizona offers three theories of injury. Arizona argues that it has standing (1) under the doctrine of *parens patriae*, (2) under § 1715 of the Class Action Fairness Act, 28 U.S.C. § 1715, and (3) because it has a participatory interest as a "repeat player." Each basis was rejected by the district court's ruling, which we review de novo. *See Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 205 (6th Cir. 2011).

A.      Standing under *Parens Patriae*

*Parens patriae*, which literally means "parent of the country," began as a common-law doctrine that allowed the sovereign (originally the King, later state governments) to assume legal responsibility (including the right to sue or defend suits) over those who are legally incapable of protecting their own rights. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 600 (1982). In its original common-law formulation, *parens patriae* was essentially a form of third-person standing that allowed the sovereign to legally step into the shoes of individual citizens. *Id.* The modern doctrine, however, is not nearly so broad. To assert standing under *parens patriae* today, a State "must assert an injury to what has been characterized as a 'quasi-sovereign' interest." *Id.* at 601. Although "quasi-sovereign" interests are not easily definable, they are those types of interests possessed by a State that fall between its sovereign interests and its proprietary or private interests. *Id.* at 601–02. There is no formal definition of a quasi-sovereign interest, and this determination can only be made on case-by-case basis. *Id.* at 606–07. However, there are some guideposts in determining whether a state has a quasi-sovereign interest.

To assert *parens patriae* "the State must articulate an interest apart from the interests of particular private parties . . . [;] the State must be more than a nominal party." *Id.* at 607. This is in direct contrast to the common-law conception of this doctrine, which allows the sovereign to intervene solely to vindicate the rights of private parties. "Interests of private parties are obviously not in themselves sovereign interests, and they do not become such simply by virtue of the State's aiding in their achievement. In such situations, the State is no more than a nominal party." *Id.* at 602. By contrast, a state has a quasi-sovereign interest "in the health and well-being—both physical and economic—of its residents in general." *Id.* at 607. Additionally, states have quasi-sovereign interests "in not being discriminatorily denied [their] rightful status within

the federal system." *Id.* In determining whether a sufficiently high proportion of the citizenry of a state face harm to their health and well-being to justify standing under *parens patriae*, the best indication is whether the State would, if it could, address the issue "through its sovereign law-making powers." *Id.*

Arizona argues that it satisfies *parens patriae* because it is acting on behalf of its citizens (the members of the nationwide settlement class who are Arizona citizens) and that it has attempted to address this type of settlement—which it argues is unfair—through legislation. The law-making exercises that Arizona cites are: (1) "ethics laws limiting the maximum fees that attorneys may charge," (2) Arizona's version of Federal Rule of Civil Procedure 23, which "requires a settlement to be fair, reasonable, and adequate for consumers," and (3) a statutory "prohibition on 'deceptive or unfair act[s] or practice[s]' in connection with the provision of services, which is applicable to contingency fees." Appellant Br. at 18 (citing Ariz. S. Ct. R. 42; Ariz. R. Civ. P. 23(e)(2); Ariz. Rev. Stat. §§ 44-1521(5), 1522(A)).

Appellees (*i.e.,* the plaintiff class and Tristar) offer several reasons why Arizona cannot establish *parens patriae* standing. We find those reasons persuasive. Two of Arizona's three proffered "law-making" examples are not products of the legislative branch at all but rather rules promulgated by the Arizona Supreme Court: one is an ethical rule, and another is a procedural rule. Additionally, Arizona's consumer fraud statute, while it is undoubtedly both an exercise of sovereign law-making power and an example of an initiative to protect the economic health and well-being of Arizona citizens, seems an inapt example in this context. At the fairness hearing, Arizona specifically disclaimed any objection to the proposed settlement on the grounds of fraud or collusion. Thus, it is not entirely certain that Arizona's sovereign law-making processes have touched on the issues to which Arizona objects. Therefore, the only objections that Arizona can make are indistinguishable from the objections which individual Arizonans might raise. As Appellees correctly point out, under *Snapp*, such claims would make Arizona "merely a nominal party" and would not give rise to any quasi-sovereign interests.

*Snapp* provides that "[a]lthough more must be alleged than injury to an identifiable group of individual residents, the indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its

population."  458 U.S. at 607.  Here, the only injury alleged is injury to an identifiable group of Arizonans (class members in the instant litigation) and Arizona has not fleshed out the indirect effects of this alleged injury on Arizona as a whole.  Therefore, Arizona has not shown any imperiled quasi-sovereign interests and does not have standing under *parens patriae*.

B.      Standing under CAFA

Arizona also argues that it has standing under the Class Action Fairness Act ("CAFA"). But CAFA does not create a right of action for state attorneys general; thus, we need not consider here the reach of the principle that Congress may "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law."  *Lujan*, 504 U.S. at 578.

Under CAFA, participants in a class-action settlement are required to notify the attorneys general of any states of which at least one class member is a citizen of the terms of the settlement.  28 U.S.C. § 1715(b).  According to Arizona, the legislative history of CAFA makes clear that this notification of state attorneys general is to give the attorneys general the opportunity, if they so desire, to intervene in the litigation.  Appellant Br. at 21 (citing S. Rep. 109-14, at 32 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 3, 32 (noting that the notice provision "is designed to ensure that a responsible state and/or federal official . . . is in a position to react if the settlement appears unfair to some or all class members")).  Arizona asserts that this legislative history, coupled with the fact that state attorneys general have in some instances intervened in class action settlements, demonstrates that CAFA gives standing to intervene.

"But 'we do not resort to legislative history to cloud a statutory text that is clear.'" *United States v. Banyan*, 933 F.3d 548, 553 (6th Cir. 2019) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994)).  Turning our attention to the text, it is true that § 1715 requires parties to notify state attorneys general of proposed settlements and mandates that final approval of settlements "may not be issued earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice." 28 U.S.C. § 1715(d).  However, § 1715 also states that "[n]othing in this section shall be construed to expand the authority of, or impose any obligations, duties, or responsibilities upon,

Federal or State officials." *Id.* § 1715(f).  Notwithstanding what Arizona attempts to glean from the legislative history of § 1715, the statute's plain text clearly forecloses Arizona's argument.

C.       Standing under Participatory Interests

Finally, Arizona asserts that it has standing because it has "participate[d] regularly in class action settlement proceedings to protect Arizona consumers and ensure statutory compliance."  Appellant Br. at 24.  In addition to participating in class action settlement proceedings, the Arizona Attorney General's office has "submitted comment letters to federal agencies" and "produced a steady stream of briefs speaking against imbalanced settlements in cases across the country."  *Id.*  Arizona cites *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240 (6th Cir. 1997) to support the proposition that being a "repeat player" in class action settlements gives Arizona standing in this case.

Arizona's reliance on *Miller* is inapposite.  *Miller* concerned what constitutes a "substantial legal interest" under Fed. R. Civ. P. 24(a) for the purposes of intervention as of right.  103 F.3d at 1245.  Under our caselaw, the substantial-legal-interest requirement under Fed. R. Civ. P. 24(a) is a lower threshold to meet than the injury-in-fact requirement of Article III standing.  *See id.* (noting that "an intervenor need not have the same standing necessary to initiate a lawsuit").  Thus even if we were to find that Arizona has a substantial legal interest under *Miller*, that would not mean that it had suffered an injury in fact for Article III standing purposes.

Arizona's regular participation in class action lawsuits establishes at most a "mere interest in [the] problem" of unfair class action settlements, which "is not . . . sufficient to confer standing."  *Greater Cincinnati Coalition for the Homeless v. City of Cincinnati*, 56 F.3d 710, 716 (6th Cir. 1995) (citing *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)).  In appealing to this interest, Arizona does not claim that Tristar has caused it any concrete, particularized harm.  The only "injury" Arizona experiences as a "repeat player in similar class action proceedings," Appellant Br. at 29, is an outcome that is contrary to its own policy views.  But "Article III standing 'is not to be placed in the hands of concerned bystanders, who will use it simply as a vehicle for the vindication of value interests.'"  *Hollingsworth v. Perry*, 570 U.S. 693, 707

(2013) (quoting *Diamond v. Charles*, 476 U.S. 54, 62 (1986)).  Accordingly, harm to Arizona's "participatory interests" is not an injury in fact sufficient to create standing under Article III.

### III.

Because Arizona's arguments concerning *parens patriae*, CAFA, and participatory interests fail, Arizona has not met its burden to demonstrate standing.  Because Arizona has no standing to bring this appeal, we are barred by Article III from determining the merits of Arizona's appeal.  We therefore **DISMISS** this appeal for want of jurisdiction.