# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 31, 2020

Lyle W. Cayce
Clerk

No. 19-60558

———————

SHRIMPERS AND FISHERMEN OF THE RGV; VECINOS PARA EL
BIENESTAR DE LA COMUNIDAD COSTERA,

>     Petitioners,

v.

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY;
JON NIERMANN, in his official capacity as Chairperson of the Texas
Commission on Environmental Quality,

>     Respondents.

———————

Petition for Review of an Action of the
Texas Commission on Environmental Quality

———————

Before HAYNES and OLDHAM, Circuit Judges, and HANEN,[*] District Judge.

PER CURIAM:

The Texas Commission on Environmental Quality ("TCEQ") granted certain air permits to Rio Grande LNG. Petitioners ask us to vacate TCEQ's decision and order either (1) a contested-case hearing before the Texas State Office of Administrative Hearings ("SOAH") or (2) the denial of the permits. It is unclear what source of law authorizes Petitioners to seek direct review of TCEQ's decision in our court. But we need not address that question because

---

[*] District Judge of the Southern District of Texas, sitting by designation.

1

No. 19-60558

we hold that Petitioners lack Article III standing. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–94 (1998). We dismiss the petition.

## I.

## A.

The Clean Air Act, 42 U.S.C. §§ 7401–7671q, combines federal and state regulation to maintain and improve the nation's air quality. At the federal level, the Environmental Protection Agency ("EPA") identifies pollutants that endanger public health. *Id.* § 7408. It then establishes maximum permissible concentrations of those air pollutants, known as the National Ambient Air Quality Standards ("NAAQS"). *Id.* § 7409.

Though EPA establishes the NAAQS, the States have the primary responsibility for implementing them. States must submit to EPA State Implementation Plans specifying how they will attain and maintain the NAAQS. *Id.* § 7407(a). Those plans must provide for New Source Review of the construction and modification of certain stationary sources of air pollution. *Id.* § 7410(a)(2)(C). New "major" sources of air pollution—such as the one proposed by Rio Grande LNG—must satisfy the requirements for Prevention of Significant Deterioration of air quality. *Id.* § 7475(a).

In Texas, TCEQ is responsible for conducting New Source Review and deciding whether to issue air-quality permits for proposed facilities. *See* TEX. HEALTH & SAFETY CODE § 382.051. The Clean Air Act requires States to give the public an opportunity to participate in permitting decisions through the submission of written comments and presentation of oral statements at a public hearing. 42 U.S.C. § 7475(a)(2). Texas exceeds these requirements by giving TCEQ the discretion to hold contested-case hearings before SOAH.[1] *See*

---

[1] "The State Office of Administrative Hearings is a state agency created to serve as an independent forum for the conduct of adjudicative hearings in the executive branch of state government." TEX. GOV'T CODE § 2003.021(a).

No. 19-60558

TEX. HEALTH & SAFETY CODE § 382.056(n) (incorporating TEX. WATER CODE § 5.556). A contested-case hearing is a trial-like "proceeding . . . in which the legal rights, duties, or privileges of a party are to be determined by a state agency after an opportunity for adjudicative hearing." TEX. GOV'T CODE § 2001.003(1). Contested-case hearings on permitting decisions are limited in scope to "disputed question[s] of fact" that were "raised during the public comment period" and are "relevant and material to the decision on the application." TEX. WATER CODE § 5.556(d). If TCEQ calls for a contested-case hearing, a SOAH administrative law judge will conduct the hearing and prepare a "proposal for decision to the commission." TEX. GOV'T CODE § 2003.047(e). The final decision rests with TCEQ, which can adopt, reject, or amend the proposal. *Id.* § 2003.047(*l*)–(m).

TCEQ "may not grant a request for a contested case hearing unless the commission determines that the request was filed by an affected person as defined by Section 5.115 [of the Texas Water Code]." TEX. WATER CODE § 5.556(c). An "affected person" is "a person who has a personal justiciable interest related to a legal right, duty, privilege, power, or economic interest affected by the administrative hearing." *Id.* § 5.115(a). An "interest common to members of the general public does not qualify as a personal justiciable interest." *Ibid.*

These criteria bear some resemblance to Article III's familiar injury-in-fact requirement. But there are also key differences. In 2015, the 84th Texas Legislature passed and Governor Greg Abbott signed Senate Bill 709. That bill added a provision to the Texas Water Code stating that TCEQ may consider "the merits of the underlying application" and "the analysis and opinions of the executive director" of TCEQ in determining whether someone is an affected person. *Id.* § 5.115(a-1).

3

No. 19-60558

Section 5.115(a-1) also states that TCEQ may not find that "a group or association is an affected person unless the group or association identifies, by name and physical address in a timely request for a contested case hearing, a member of the group or association who would be an affected person in the person's own right." *Id.* § 5.115(a-1)(2). And it instructs TCEQ to "adopt rules specifying factors which must be considered in determining whether a person is an affected person." *Id.* § 5.115(a-1); *see also* 30 TEX. ADMIN. CODE § 55.203 (specifying factors).

Once TCEQ has made a final decision, the Texas Clean Air Act provides that a "person affected by a ruling, order, decision, or other act of the commission . . . may appeal the action by filing a petition in a district court of Travis County." TEX. HEALTH & SAFETY CODE § 382.032(a). "The petition must be filed within 30 days" of the action from which the petitioner is appealing. *Id.* § 382.032(b). Filing a timely petition "is a jurisdictional requirement," and "dismissal" is the "necessary consequence" of filing an untimely petition. *AC Interests, L.P. v. TCEQ*, 543 S.W.3d 703, 709 (Tex. 2018). Neither the federal Clean Air Act nor the Texas Clean Air Act says anything about filing a petition for review of TCEQ's decision in this court.

B.

The Petitioners in this case are two membership organizations: Shrimpers and Fishermen of the RGV ("Shrimpers") and Vecinos Para el Bienestar de la Comunidad Costera ("Vecinos"). They oppose Rio Grande LNG's plans to construct a natural gas liquefaction facility, export terminal, and pipeline near Brownsville, Texas. Petitioners submitted a comment to TCEQ asking for a contested-case hearing on Rio Grande LNG's application for air-quality permits. In the alternative, they asked TCEQ to deny the permits. TCEQ rejected both requests and granted Rio Grande LNG the permits. Petitioners filed a motion for rehearing, which TCEQ denied.

4

No. 19-60558

Petitioners filed a state-court lawsuit seeking vacatur of TCEQ's decision and either a contested-case hearing or a denial of the permits. Plaintiffs' Original Petition, *Shrimpers & Fishermen of the RGV v. TCEQ*, No. D-1-GN-19-001306, 2019 WL 1209098 (250th Dist. Ct., Travis County, Tex. Mar. 12, 2019). The state suit alleged that TCEQ erred in granting the permits and that Petitioners were "affected persons" entitled to request a contested-case hearing under Texas law.

While the state case was pending, Petitioners filed a petition for review in our court. Like the state lawsuit, this suit alleges that TCEQ erred in granting air-quality permits to Rio Grande LNG and that Petitioners were "affected persons" entitled to request a contested-case hearing under Texas law. Petitioners also asked us for the same relief they requested in state court. Given the unusual posture of this case—a petition seeking direct review of a *state* agency's decision in the Fifth Circuit—we asked Petitioners to submit a letter brief explaining what source of law provided them with a cause of action.

II.

We need not decide whether Petitioners have a cause of action because they do not have standing. A petitioner who seeks judicial review of agency action invokes federal jurisdiction and therefore "bears the burden of establishing" Article III standing. *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). We agree with our sister circuits that in direct appellate review of a final agency action, "the petitioner carries a burden of production" with respect to standing that is "similar to that required at summary judgment." *Sierra Club v. EPA*, 793 F.3d 656, 662 (6th Cir. 2015); *see also Ga. Republican Party v. SEC*, 888 F.3d 1198, 1201 (11th Cir. 2018); *N. Laramie Range Alliance v. FERC*, 733 F.3d 1030, 1034 (10th Cir. 2013); *Iowa League of Cities v. EPA*, 711 F.3d 844, 869–70 (8th Cir. 2013); *Citizens Against Ruining the Env't v. EPA*,

535 F.3d 670, 675 (7th Cir. 2008); *Sierra Club v. EPA*, 292 F.3d 895, 899–901 (D.C. Cir. 2002). This means that a petitioner's claim of standing cannot rest on "mere allegations," but must instead be supported by citations to specific facts in the record. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013) (quoting *Lujan*, 504 U.S. at 561).

The familiar elements of standing are (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the respondent, and (3) that is likely to be redressed by a favorable judicial decision. *See Ctr. for Biological Diversity*, 937 F.3d at 536. Because Petitioners are membership organizations, they must make the additional showing of associational standing. To establish associational standing, Petitioners must show that (1) their members would independently have Article III standing to sue, (2) the interests they seek to protect are germane to their purposes, and (3) neither the claim asserted nor the relief requested requires the participation of individual members. *See ibid.* We need only consider the first prong of both tests: We conclude Petitioners have not satisfied their burden to show their members' injuries in fact.

## A.

To establish an injury in fact, Petitioners must show an "invasion of a legally protected interest" that is both "concrete and particularized" and also "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560). We do not recognize the concept of "probabilistic standing" based on a non-particularized "increased risk"—that is, an increased risk that equally affects the general public. Suits alleging "generalized grievances" do "not present constitutional 'cases' or 'controversies.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 n.3 (2014).

Moreover, even if a petitioner's increased-risk harms *are* particularized, they also must be actual or imminent. *See Susan B. Anthony List v. Driehaus*,

573 U.S. 149, 158 (2014); *Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019). The "actual or imminent" requirement is satisfied only by evidence of a "certainly impending" harm or a "substantial risk" of harm. *Clapper*, 568 U.S. at 414 & n.5; *see also Sierra Club v. EPA*, 754 F.3d 995, 1001 (D.C. Cir. 2014) (quoting *Nat. Res. Def. Council v. EPA*, 464 F.3d 1, 6 (D.C. Cir. 2006)). Increased-risk claims—even when they are particularized—often cannot satisfy the "actual or imminent" requirement. As then-Judge Kavanaugh once wrote for the D.C. Circuit, there is "a powerful argument that 'increased-risk-of-harm' claims . . . fail to meet the constitutional requirement that a plaintiff demonstrate harm that is 'actual or imminent, not conjectural or hypothetical.'" *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1294 (D.C. Cir. 2007) (quoting *Lujan*, 504 U.S. at 560). "Much government regulation slightly increases a citizen's risk of injury—or insufficiently decreases the risk compared to what some citizens might prefer." *Id.* at 1295. "Opening the courthouse to these kinds of increased-risk claims would drain the 'actual or imminent' requirement of meaning," "expand the 'proper—and properly limited'—constitutional role of the Judicial Branch beyond deciding actual cases or controversies," and "entail the Judiciary exercising some part of the Executive's responsibility to take care that the law be faithfully executed." *Ibid.* (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)); *see also Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005) (Sentelle, J.).

In this case, Petitioners identify several members who they argue have standing to challenge TCEQ's grant of air-quality permits to Rio Grande LNG. Lela Burnell (Shrimpers) lives within eighteen miles of the proposed facility and works within five miles. Jamie Garcia (Shrimpers) lives a similar distance from the proposed facility and fishes near it in the Brownsville Ship Channel. Amber Thomas (Shrimpers) lives within eleven miles of the proposed facility

and works within five miles. All three regularly drive by the proposed facility's location on State Highway 48. Erika Avila (Vecinos) lives about five-and-a-half miles from the proposed facility, drives to work on State Park Road 100 about three miles from the proposed facility, and occasionally passes by the proposed facility's location on State Highway 48 when she visits Brownsville.

In their opening brief, Petitioners claim that "evidence in the record from Rio Grande LNG's and TCEQ's modeling shows elevated risks of harm from the facility's air emissions at distances of more than 14 miles from the facility." Even if we charitably construe this argument as claiming that individuals living, working, and driving within a roughly fourteen-mile radius of the proposed facility (*i.e.*, Petitioners' members) will suffer an increased risk of harm that those living further away will not suffer, these claims are too generalized and Petitioners have not produced enough evidence to show an actual or imminent harm.

Even if Petitioners' members did identify specific risks, there is no evidence of the extent to which those risks would be increased for those members by the expected emissions. "Without actual evidence" from the Petitioners, we will not "wade" into the "morass" of such empirical questions. *Crete Carrier Corp. v. EPA*, 363 F.3d 490, 494 (D.C. Cir. 2004) (quoting *Common Cause v. U.S. Dep't of Energy*, 702 F.2d 245, 252 (D.C. Cir. 1983)). In the procedural posture of this case—direct review of a final agency action— Petitioners' claims to standing fail because they rest on "mere allegations," rather than concrete evidence. *Clapper*, 568 U.S. at 412 (quoting *Lujan*, 504 U.S. at 561); *see also Sierra Club*, 292 F.3d at 901 (noting that mere allegations "are not evidence").

Petitioners also argue that the proposed facility would cause ozone levels to be "very close to violating the federally mandated" NAAQS. Petitioners again fail to identify what specific health risks their members expect to suffer.

No. 19-60558

And there is again no evidence concerning the extent to which the expected omissions would increase any such risks for Petitioners' members. Because this argument is also based on mere allegations rather than concrete evidence, it too falls short. *See Clapper*, 568 U.S. at 412; *Sierra Club*, 292 F.3d at 901.

Petitioners present no other arguments that their members will suffer imminent injuries from air pollution emitted by the proposed facility. They have shown neither a certainly impending harm nor a substantial risk of harm. As such, they have failed to establish Article III standing based on health risks to their members.[2]

B.

To the extent Petitioners argue that the denial of a contested-case hearing is a procedural harm separate and distinct from the harms they expect to be caused by the proposed facility, we reject that alleged injury as a basis for standing. A petitioner can have standing to enforce procedural rights only if "the procedures in question are designed to protect some threatened concrete interest" that is "the ultimate basis of his standing." *Lujan*, 504 U.S. at 573 n.8. Petitioners have failed to demonstrate a concrete interest that provides them with standing. *See supra* Part II.A. Their assertion of "a procedural right *in vacuo*" is therefore "insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *see also Ctr. for Biological Diversity*, 937 F.3d at 543.

---

[2] Petitioners raise a few other arguments for standing that are developed in only a cursory fashion. Their members claim that the proposed facility could harm wildlife, reduce their customers, and experience accidents or explosions. These claims are "too speculative for Article III purposes," as they are not supported by any evidence. *Lujan*, 504 U.S. at 564 n.2; *see also Clapper*, 568 U.S. at 414; *Little v. KPMG LLP*, 575 F.3d 533, 540–41 (5th Cir. 2009). "Article III demands more than such conclusory assertions." *Ctr. for Biological Diversity*, 937 F.3d at 545.

No. 19-60558

\* \* \*

Because we conclude that Petitioners lack Article III standing, we decline to address the merits of their petition. The petition for review is DISMISSED.

ANDREW S. OLDHAM, Circuit Judge, concurring.

I agree with my esteemed colleagues that Petitioners have not established standing. Article III jurisdiction is always first. *In re Gee*, 941 F.3d 153, 170–71 (5th Cir. 2019) (per curiam); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). Here, it's also last.

I nonetheless write separately to make two points about Petitioners' purported cause of action. First, what it is. And second, why it matters.

*First*, Petitioners say their cause of action comes from either the Administrative Procedure Act, 5 U.S.C. §§ 701–706 ("APA"), or the Natural Gas Act as amended by the Energy Policy Act of 2005, 15 U.S.C. § 717r(d)(1). While TCEQ and Rio Grande LNG disagree with Petitioners on a lot of things, they agree on this. All of the parties point to the APA and § 717r(d)(1).

The parties offer no reason to think the APA is relevant. True, it provides a right of action to "[a] person suffering legal wrong because of agency action." 5 U.S.C. § 702. But the APA defines an "agency" as an "authority of the Government of the United States." *Id.* § 701. TCEQ is an agency of the sovereign State of Texas. So it's unclear how the APA provides a right to petition for review of TCEQ orders.

Petitioners fare no better under the Natural Gas Act. It provides in relevant part:

> The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as "permit") required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

15 U.S.C. § 717r(d)(1).

11

No. 19-60558

Although this provision vests our Court with "original and exclusive jurisdiction" to hear "any civil action" challenging certain TCEQ orders, it does not *create* "any civil action." It does not vest any person or class of persons with a right of review. *Cf.* 5 U.S.C. § 702. It does not specify who can be sued as a defendant. *Cf. ibid.* And it does not specify a standard of review. *Cf. id.* § 706. It just says *if* you have a civil action, our court has exclusive jurisdiction over it.

By way of comparison, consider the statute that gives us general federal-question jurisdiction. It says: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Does that *create* "all civil actions arising under the Constitution, laws, or treaties of the United States"? Of course not: Section 1331 "does not create causes of action, but only confers jurisdiction to adjudicate those arising from other sources which satisfy its limiting provisions." *Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 249 (1951). Section 717r(d)(1) operates in precisely the same way. It doesn't *create* a cause of action. It merely provides us with jurisdiction to hear whatever causes of action Petitioners might otherwise have.

So what *is* the source of Petitioners' cause of action? It appears to be state law. Their claims here are materially identical to the state-law claims they previously brought in state court. *See* Plaintiffs' Original Petition, *Shrimpers & Fishermen of the RGV v. TCEQ*, No. D-1-GN-19-001306, 2019 WL 1209098 (250th Dist. Ct., Travis County, Tex. Mar. 12, 2019).

If it's true that Petitioners have only state-law claims, then that creates more questions than it answers. You might reasonably wonder whether Congress actually wrote a statute that gives us federal jurisdiction over state-law claims brought by Texans against the State of Texas. *See, e.g., Gunn v. Minton*, 568 U.S. 251, 256 (2013). You might also ask whether Article III allows

us to hear such claims. *See, e.g.*, U.S. CONST. art. III, § 2 (limiting the "judicial Power" to *inter alia* "all Cases, in Law and Equity, arising under this Constitution, the laws of the United States, and Treaties" and "to Controversies . . . between Citizens of different States").

Start with the statutory question. A long line of Supreme Court cases addresses whether Congress wrote a particular jurisdictional statute in broad enough terms to include state-law causes of action. Most of these cases concern § 1331 and linguistically similar statutes. *See, e.g.*, *Gunn*, 568 U.S. at 257. And in that context, the Supreme Court once had a simple rule: "A suit arises under the law that creates the cause of action." *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916). That is, if *federal* law created the plaintiff's cause of action, then the "action[] aris[es] under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, and Congress gave us jurisdiction over it. Contrariwise, if *state* law created the cause of action, then Congress did not give us jurisdiction over it in § 1331 (and linguistically similar statutes).

Consider *American Well Works*. In that case, the plaintiff allegedly owned a patent for a pump that it manufactured and sold. 241 U.S. at 258. The plaintiff alleged that the defendants violated state law by falsely telling users of the pump that they were infringing the defendants' patent, frivolously suing some of them for patent infringement, and threatening to file other frivolous patent-infringement suits. *Ibid.* Sure, federal patent issues were "piece[s] of evidence," but that didn't matter. The Supreme Court held that the suit arose under *state* law because a "suit arises under the law that creates the cause of action." *Id.* at 260. It was not a federal question at all. End of story.

The Supreme Court has since complicated the statutory question. In post-1916 cases, the Court has recognized a "slim," "special[,] and small" category of cases that originate under state law and still trigger federal-

question jurisdiction. *Gunn*, 568 U.S. at 258 (quotation omitted). To determine if a state-law claim falls in that narrow category, the Court asks whether it: "[1] necessarily raise[s] a stated federal issue, [2] actually disputed and [3] substantial, [4] which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005). It's difficult to predict what result this four-factor balancing test would yield in any particular case. *See id.* at 321 (Thomas, J., concurring) (noting the test "is anything but clear"). But the important point is that you cannot simply assume that Congress gave us jurisdiction to consider a purely state-law dispute between in-state parties.

But even if you did assume it, you'd run headlong into a constitutional question. Here's why. Assume § 717r(d)(1) plainly gives us statutory jurisdiction over purely state-law disputes for contested-case hearings. Then we'd have to consider whether such a capacious statute is consistent with Article III. *Compare Shoshone Mining Co. v. Rutter*, 177 U.S. 505, 513 (1900) ("[T]he mere fact that a suit is an adverse suit authorized by the statutes of Congress is not in and of itself sufficient to vest jurisdiction in the Federal courts."), *with Grable*, 545 U.S. at 317 n.5 (describing *Shoshone* as an "extremely rare" case). As with the four-factor *Grable* question, this one is difficult. *Cf.* RICHARD H. FALLON, JR. ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 805 (7th ed. 2015) (arguing that the Clean Air Act's citizen-suit provision, which provides a federal cause of action to challenge state implementation plans, "push[es] against the limits of Article III"). And as with the statutory question, we cannot simply assume the answer to it.

*Second*, why this matters. It doesn't in one sense. In *Steel Co.*, the Supreme Court held that the existence of a cause of action is a "merits

question" that cannot be decided before resolving the preliminary question of Article III jurisdiction. 523 U.S. at 93–94. Because we lack jurisdiction, the merit (or demerit) of the cause-of-action question doesn't really matter.

But it *does* matter in another sense. These are sophisticated and well-counseled parties. And TCEQ in particular has a wealth of institutional knowledge about precisely where it can be sued, for what, and by whom. But no one involved in this case—including TCEQ—heard even the softest alarm bell when Petitioners brought their *state-law* cause of action for a contested-case hearing in *federal* court. Even after we asked for supplemental briefing on it. And even after it came up at oral argument. Petitioners, TCEQ, and Rio Grande LNG never questioned our power to adjudicate that state-law claim and to order a state agency to comply with state procedures for contested-case hearings. *Cf. Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984).

It is our duty to ask these questions every time a party invokes the judicial power of the United States. Because even when all parties *really want* us to exercise that power, we have an enduring obligation to remember what federal courts do—and perhaps more importantly what we don't.

15