# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 10, 2024

Lyle W. Cayce
Clerk

———————

No. 23-60079

———————

STATE OF TEXAS; STATE OF LOUISIANA; STATE OF UTAH; STATE OF WEST VIRGINIA,

*Petitioners*,

*versus*

SECURITIES AND EXCHANGE COMMISSION,

*Respondent*.

———————————————————

Petition for Review of a Final Action of
the United States Securities and Exchange Commission
87 Fed. Reg. 78770

———————————————————

Before DENNIS, SOUTHWICK, and HO, *Circuit Judges*.

PER CURIAM:[*]

The states of Texas, Louisiana, Utah, and West Virginia challenge a Final Rule of the Securities and Exchange Commission requiring funds to disclose their votes on environmental, social, and governance (ESG) matters. *See Enhanced Reporting of Proxy Votes by Registered Management Investment Companies; Reporting of Executive Compensation Votes by Institutional*

———————————————

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 23-60079

*Investment Managers*, 87 Fed. Reg. 78770 (Dec. 22, 2022).    Because Petitioners have not established standing, we dismiss their petition for review for lack of jurisdiction.

## I.

Funds that pool money from investors to purchase securities must file their proxy voting records with the SEC annually on Form N-PX.  Currently, Form NP-X requires funds to briefly describe each matter voted on.  In 2021, the Commission proposed an amendment to the Form that would require funds to categorize votes by subject matter.

The proposed rule included seventeen categories.  The categories covered "matters on which funds frequently vote, based on [Commission] staff's experience and review of the matters on which funds voted in 2020."  Five of the seventeen proposed categories involved ESG concerns.

During the comment period, some commenters voiced concerns about requiring funds to disclose ESG votes.  In particular, the state of Utah warned that the use of ESG categories could empower activists to pressure funds into voting for ESG measures while providing limited value to investors.  The comment speculated that such pressures could cause managers to breach fiduciary duties owed to investors.

In December 2022, the Commission adopted the categorization requirement in its Final Rule.  The Final Rule decreased the number of categories from seventeen to fourteen.  Four of the final categories are ESG-focused.

The rule is scheduled to go into effect on July 1, 2024.

The states of Texas, Louisiana, Utah, and West Virginia filed a petition for review in this court under the Administrative Procedure Act.  15 U.S.C. § 78y(b)(1).

The States seek prospective relief under the APA. Because we find that the States lack standing, we do not proceed to the merits of their claim.

## II.

"Like a plaintiff who files a complaint, a petitioner who seeks review of agency action 'invok[es] federal jurisdiction' and therefore 'bears the burden of establishing' standing." *Ctr. for Biological Diversity v. EPA*, 93 F.3d 533, 536 (5th Cir. 2019) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). To have Article III standing, a plaintiff must show an injury in fact that is fairly traceable to the challenged action of the defendant and likely to be redressed by the plaintiff's requested relief. *Lujan*, 504 U.S. at 560–61.

For standing purposes, we treat a petition for review like summary judgment and require petitioners to support a claim of standing with "specific facts in the record." *Shrimpers and Fishermen of RGV v. Tex. Comm'n on Env't Quality*, 968 F.3d 419, 423 (5th Cir. 2020). "Only one of the petitioners needs to have standing to permit us to consider the petition for review." *Mass. v. EPA*, 549 U.S. 497, 518 (2007).

## III.

The States assert two theories of standing. First, they argue that the States themselves suffer injury as investors in funds subject to the Rule, because they claim that the funds will pass the costs of the Rule on to all investors. Second, they invoke the doctrine of *parens patriae* to vindicate the States' "quasi-sovereign" interest in their citizens' economic well-being. *See La. ex rel. La. Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 881 (5th Cir. 2023). We address both grounds in turn.

## A.

We begin by discussing the States' claim of threatened future economic injury. They advance a cost pass-through theory: Funds will incur

increased regulatory costs from having to categorize votes and report the categories. They will then pass those costs along to individual investors, including the States.

In theory, cost pass-throughs can support a claim of standing. *See, e.g.*, *Cent. Az. Water Conservation Dist. v. EPA*, 990 F.2d 1531 (9th Cir. 1993); *Cmty. Nutrition Inst. v. Block*, 698 F.2d 1239, *rev'd on other grounds*, *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340 (1984). *Cf. United States v. Students Challenging Regul. Agency Proc.*, 412 U.S. 669 (1973). "Common sense and basic economics" can indeed help determine questions of standing, *see Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 (D.C. Cir. 2017), and it is a matter of common sense that entities often respond to increased costs by raising prices for third parties with whom they transact. As the States note, "the managers of mutual funds [like those invested in by Texas] are generally inclined to pass [regulatory] expenses on to the fund's investors."

But there's a difference between theory and practice. As the States conceded during oral argument, there is no guarantee that regulated parties will always pass costs on to their consumers. Some costs may be too small to warrant a cost pass-through.

So any cost pass-through must be established through evidence. We look to the evidence in the record to determine whether the facts of a specific case support "likely . . . pecuniary harm" to a suing party. *Cent. Az. Water Conservation Dist.*, 990 F.2d at 1538. Evidence couched in hypothetical language cannot support such an injury. *See Chamber of Com. v. EPA*, 642 F.3d 192, 201–02 (D.C. Cir. 2011).

Here, the record provides only speculation about the possibility of increased costs to investors as a result of new regulatory burdens on the funds. The States submit a declaration that they "may incur additional

expenses" passed down from funds. Evidence that funds *may* increase costs for investors is too hypothetical to support a claim of standing.

The States also quote a statement by the SEC that the Rule would "lead to some additional costs for funds," and that "[a]ny portion of these costs that is not borne by a fund's adviser or other sponsor will ultimately be borne by the fund's shareholders." 87 Fed. Reg. at 78,795. But that is a tautology—the fact that the funds will pass on whatever costs they don't absorb themselves does not mean that they will actually pass on any costs to anyone.

Without evidence of a cost pass-through, we cannot say that the States have established a "substantial risk" that investors will suffer economic injury. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013)). The States have not shown standing on these grounds.

## B.

Having held that the record does not show a substantial threat of economic injury to investors, we turn to the States' attempt to establish standing under the doctrine of *parens patriae*.

The States argue that the term "*parens patriae*" actually encompasses two different kinds of lawsuits. The first allows a state to litigate on behalf of citizens who cannot represent themselves. The second allows a state to assert its own sovereign or quasi-sovereign interest "separate and apart from their citizens' interests." *Kentucky v. Biden*, 23 F.4th 585, 596 (6th Cir. 2022) (citing *Chapman v. Tristar Prod., Inc.*, 940 F.3d 299, 305 (6th Cir. 2019)).

Generally, a state cannot bring a *parens patriae* suit against the federal government. *See Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rice ex rel. Barez*, 458 U.S. 592, 610 n.16

(1995)). Circuits are split, however, on whether and to what extent states can still bring a *parens patriae* suit against the federal government when a state asserts its own sovereign or quasi-sovereign interest. *Compare Kentucky*, 23 F.4th at 596, *with Gov't of Manitoba v. Bernhardt*, 923 F.3d 173 (D.C. Cir. 2019).

We need not take sides in that split because this suit cannot proceed regardless. When the States invoke *parens patriae* to support standing against the SEC in this case, we take them to be referring to the second kind of suit. That is, the States assert their "quasi-sovereign interest in the general economic well-being of its residents." *La. Dep't of Fisheries & Wildlife*, 70 F.4th at 881.

But there is insufficient record evidence that the Rule infringes this interest. The States argue that Texas residents who invest in funds subject to the categorization requirement will bear the regulatory costs passed on by funds. This argument runs into the same problem described above—the States have not offered sufficient evidence that the funds will indeed pass costs on to investors.

The States also argue that requiring funds to disclose ESG votes will damage the oil and gas industries in Texas by making it easier for activists to apply pressure on funds to disinvest from energy producers. This theory relies on a "highly attenuated chain of possibilities" not presently supported by the record. *Clapper*, 568 U.S. at 410. *See also El Paso Cty. v. Trump*, 982 F.3d 332, 341 (5th Cir. 2020) ("incidental and attenuated" "economic impact . . . is insufficient to grant a state . . . standing").

Without more evidence of the economic impact of the categorization requirement on Texas's citizens, we have no need to determine whether the state can bring a suit against the federal government on these grounds.

* * *

No. 23-60079

The States have not established standing to bring this petition for review. We accordingly dismiss the petition for review without prejudice.

JAMES C. HO, *Circuit Judge*, concurring in the judgment:

I agree that there is not sufficient evidence in the record to establish the States' standing, and that we are accordingly duty bound to dismiss the petition for review. Of course, if the States believe that they can assemble stronger evidence of injury than that presently available in this record, they may refile. And it appears that the States believe that they can.

## I.

During oral argument, counsel for the States observed that the cost of complying with the challenged SEC rule may be more considerable than the record evidence presently indicates. Counsel suggested that it will not be obvious how best to categorize certain votes under the proposed rule. Oral Argument at 20:30–20:45.

So we presented the issue to the SEC's counsel. We asked whether a measure relating to environmental racism should be categorized as an environmental matter, as a diversity, equity, and inclusion matter, or as a human rights matter. Counsel for the SEC admitted that he did not know. *Id.* at 28:55–30:01. We asked how funds should categorize a measure concerning sexual harassment, or another measure concerning abortion. Counsel for the SEC again conceded that he did not know. *Id.* at 30:47–31:13. He agreed that there would be judgment calls that funds would have to make—and inevitable disagreements over those judgment calls. *Id.* at 30:29–30:45.

These admitted ambiguities and anticipated disputes over the proper categorization of measures could support a valid theory of economic injury. Counsel for the States noted the risk of an SEC enforcement action if a fund made a categorization decision that the Commission later deemed incorrect. As a result, counsel for the States predicted that funds would be forced to endure meaningful legal and other expense in order to minimize those risks—

and that the costs might well be substantial enough to warrant passing on to investors. *Id.* at 19:50–20:50.

So again, we asked counsel for the SEC if, in light of the admitted risks, he could at least assure us that the Commission would take no enforcement action against any fund that made a categorization decision that it disagreed with. Counsel for the SEC was unable to provide any such assurance. *Id.* at 37:25–38:26.

## II.

These are interesting—and potentially viable—theories of injury. But they are not supported by record evidence. The capable Solicitor General of Texas, who presented oral argument for the States, did not appear in this matter during the briefing stage, and presumably played no role in assembling the record evidence of injury.

The lack of such record evidence prevents us from crediting these theories of injury at this time. As our court has repeatedly observed, "[n]ew arguments or legal theories first raised at oral argument are waived." *Shah v. Azar*, 920 F.3d 987, 994 n. 19 (5th Cir. 2019). (Technically, new theories raised for the first time at oral argument are forfeited, not waived. *See*, *e.g.*, *Rollins v. Home Depot*, 8 F.4th 393, 397 (5th Cir. 2021).)

But the lack of record evidence does not prevent the States from refiling in the future with stronger evidence of injury. *See*, *e.g.*, *Lopez v. Pompeo*, 923 F.3d 444, 447 (5th Cir. 2019) ("A dismissal for lack of jurisdiction . . . does not operate as an adjudication on the merits. The dismissal permits a second action on the same claim that corrects the deficiency found in the first action.") (cleaned up); *Griener v. United States*, 900 F.3d 700, 705 (5th Cir. 2018) ("[D]ismissal for want of jurisdiction" is "without prejudice to the plaintiff's claims.") (citation omitted); *Hughes v. United States*, 71 U.S. 232, 237 (1866) ("If the first suit was dismissed for . . .

want of jurisdiction . . . the judgment rendered will prove no bar to another suit."); *see also Martin-Trigona v. Fed. Rsrv. Bd.*, 509 F.2d 363, 367 (D.C. Cir. 1974) (petitioner "has no standing at present to seek review" but could "present facts indicating" standing and then refile).

\* \* \*

"It's no small thing to tell a litigant that the court will not even consider the merits of their claim—that it doesn't matter if a defendant has broken the law and injured others—because the Constitution forbids us from granting you any relief." *Jackson Mun. Airport v. Harkins*, 98 F.4th 144, 147–48 (5th Cir. 2024) (Ho, J., concurring). So "when it does, it's incumbent upon us to spell out what principles require dismissal for lack of standing." *Id.* at 148.

In that spirit, it is entirely consistent with the judicial function to explain what a party could do in the future to cure any standing deficiencies identified in a pending case. *See, e.g.*, *California v. Texas*, 593 U.S. 659, 705 n.9 (2021) (Alito, J., dissenting) (explaining how plaintiffs "may file a new action"); *see also La. Fair Hous. Action Ctr. v. Azalea Garden Props., L.L.C.*, 82 F.4th 345, 356–58 (5th Cir. 2023) (Ho, J., concurring) (same); *Campaign Legal Centr. v. Scott*, 49 F.4th 931, 939–41 (5th Cir. 2022) (Ho, J., concurring in the judgment) (same).

Of course, I venture no predictions about whether the States will in fact choose to refile here. One could ask whether stronger disclosure of ESG ballot measures would help both sides in any vote. To be sure, the States that brought this petition presumably believe that the SEC promulgated this rule in order to favor one side of these social controversies. But the law of unintended consequences teaches us that any rule can have unanticipated effects. *Cf.* Genesis 50:20. Opinions in this area can—and do—change over time. *See, e.g.*, Clara Hudson & Riddhi Setty, *Firms From KKR to Coors*

*Flag DEI as Business, Legal Risk*, Bloomberg, Mar. 11, 2024 (noting "a growing group of companies listing DEI as a 'risk factor' in their securities filings"); Taylor Telford & Julian Mark, *DEI is getting a new name. Can it dump the political baggage?*, Wash. Post, May 5, 2024 ("A growing number of companies . . . are either listing DEI as a 'risk factor' in shareholder reports or removing mentions of diversity goals outright.").

But be that as it may, I concur in the judgment of the court dismissing the petition for review, with the understanding that we do so without prejudice.