NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0392n.06

Case No. 20-3557

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| SUSAN BEIERSDORFER, et al | ) | **FILED** |
| | ) | Aug 20, 2021 |
| Plaintiffs - Appellants, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| FRANK LAROSE, et al, | ) | STATES DISTRICT COURT FOR THE |
| | ) | NORTHERN DISTRICT OF OHIO |
| Defendants - Appellees. | ) | |
| | ) | |
| | ) | |

BEFORE: GIBBONS, WHITE, and READLER, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. The plaintiffs are environmental activists, affiliated with various groups, who have sought to use Ohio's citizen initiative process to pass county charters and municipal ordinances touching on environmental issues. The "Initiative Authority Statutes" allow county boards of elections to "prescreen" proposed initiatives to ensure compliance with state law. For proposed county-charter initiatives, the board of elections must ensure that the petition includes all the county positions and powers mandated by state law. For proposed municipal-ordinance initiatives, the board must ensure that the proposal takes legislative rather than administrative action. The plaintiffs complain that the defendants—members of various county boards of elections and the Ohio secretary of state—have unconstitutionally applied the Initiative Authority Statutes to prevent the plaintiffs from placing their proposed initiatives on the ballot. The plaintiffs sought declaratory and injunctive relief, alleging violations of the First, Fourteenth, and Ninth Amendments, as well as state law. The district court dismissed the claims

against one of the defendant boards of elections because the plaintiffs lacked standing. The district court also concluded that the state law claim was barred by sovereign immunity, and that the complaint failed to allege any constitutional violations. We dismiss an additional county board of elections for lack of standing and affirm the district court in all other respects.

I.

Ohio citizens can pass laws through the state's initiative process, which includes the power to enact a county charter, Ohio Const. art. X, § 3, and a municipal ordinance, *id*. art. II, § 1f.[1] But before a local initiative can reach the ballot, Ohio's "Initiative Authority Statutes" direct the county board of elections to "determine whether" the proposed county-charter or municipal-ordinance initiative "falls within the scope of authority to enact via initiative." Ohio Rev. Code Ann. § 3501.11(K)(2); *see also id.* §§ 3501.38(M), 3501.39(A). In other words, the county board of elections prescreens each proposed initiative to "determine whether the petition and the signatures on the petition meet the requirements of law." *Id*. § 307.95(A). For a county charter, the board of elections must verify that the proposed initiative "provide[s] the form of government of the county" and details the powers and duties of county officials. Ohio Const. art. X, § 3; *see also State ex rel. Walker v. Husted*, 43 N.E.3d 419, 425 (Ohio 2015) ("[S]et[ting] forth the form of government . . . is the sine qua non of a valid charter initiative."). For a municipal ordinance—as opposed to a municipal *charter*[2]—the board of elections must ensure that the initiative takes legislative, not administrative, action. Ohio Const., art. II, § 1f; *State ex rel. Ebersole v. Delaware Cnty. Bd. of Elections*, 20 N.E.3d 678, 684 (Ohio 2014) ("The test for determining whether an

---

[1] They also possess the separate power to amend municipal charters. *See* Ohio Const. art. XVIII, §§ 7, 9.

[2] Ohioans also have the power to amend municipal charters, Ohio Const. art. XVIII, §§ 7, 9, but the Initiative Authority Statutes at issue here do not apply to that power. *See State ex rel. Maxcy v. Saferin*, 122 N.E.3d 1165, 1168–69, 1171 (Ohio 2018) ("[B]oards of elections have no authority to review the substance of a proposed municipal-charter amendment . . . [T]he duty of the board is to simply add the proposed charter amendment to the ballot.").

action is legislative or administrative is 'whether the action taken is one enacting a law, ordinance, or regulation, or executing a law, ordinance, or regulation already in existence.'" (quoting *Donnelly v. City of Fairview Park*, 233 N.E.2d 500, 500 (Ohio 1968))). "[I]f any portion of the petition is not within the initiative power," then "[t]he petition shall be invalid." Ohio Rev. Code Ann. §§ 3501.11(K)(2), 3501.38(M)(1)(a), 3501.39(A)(3). If the board of elections determines that the petition is invalid, the petition is not submitted to the electorate for consideration.

Proponents of an invalidated initiative are entitled to judicial review of the board's decision. The proponent of a county charter can request that the board bring an action in a common pleas court to establish the validity of the petition. Ohio Rev. Code Ann. § 307.94. Similarly, the proponent of a municipal ordinance can seek an injunction in a common pleas court.[3] *See, e.g.*, *Storegard v. Bd. of Elections of Cuyahoga Cnty.*, 255 N.E.2d 880, 881 (Ohio Com. Pl. 1969); Ohio Rev. Code Ann. § 2506.01. Alternatively, the proponent of a county-charter initiative can file a written protest to the board's decision, which the board is obligated to deliver to the Ohio secretary of state. Ohio Rev. Code Ann. § 307.95. If the secretary agrees[4] with the board's decision invalidating the proposed initiative, the proponent can seek a writ of mandamus from the Ohio Supreme Court to compel placement of the charter on the ballot. *See, e.g.*, *State ex rel. Coover v. Husted*, 70 N.E.3d 587, 588–89 (Ohio 2016) (per curiam). The proponent of a municipal-ordinance initiative can likewise seek a writ of mandamus from the Ohio Supreme Court instead of proceeding in a common pleas court. *See, e.g.*, *State ex rel. Citizens for Responsible Green Gov't v. City of Green*, 118 N.E.3d 236, 240–41 (Ohio 2018). The Ohio Supreme Court considers

---

[3] It appears that this procedure is more commonly used when the board of elections certifies an ordinance for placement on the ballot, and an opponent seeks an injunction to prevent the placement. *See, e.g.*, *State ex rel. N. Main St. Coal. v. Webb*, 835 N.E.2d 1222, 1226 (Ohio 2005); *Myers v. Schiering*, 271 N.E.2d 864, 864 (Ohio 1971).

[4] But if the secretary determines that the proposed initiative is valid, then the proposed charter is placed on the ballot. Ohio Rev. Code Ann. § 307.95(D).

the validity of the proposed initiative "essentially" de novo, *Schmitt v. LaRose*, 933 F.3d 628, 639–40 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 2803 (2020), and resolves these ballot-access disputes on an expedited timeline, *see* Ohio S.Ct.Prac.R. 12.08(A).

Plaintiffs Susan Beiersdorfer and Dario Hunter are members of Frackfree Mahoning Valley, which tried to amend the Youngstown Municipal Charter in 2017. The Mahoning County Board of Elections concluded that the proposal—the Youngstown Drinking Water Protection Bill of Rights—exceeded Youngstown's legislative power by creating new causes of action and refused to place it on the ballot. The plaintiffs filed a writ of mandamus with the Ohio Supreme Court protesting that decision. The Ohio Supreme Court denied the writ, finding that the proposed municipal charter amendments exceeded the city's authority to enact by initiative and were therefore properly excluded from the ballot. *State ex rel. Flak v. Betras*, 95 N.E.3d 329, 333 (Ohio 2017), *abrogated by State ex rel. Maxcy v. Saferin*, 122 N.E.3d 1165 (Ohio 2018). The board again refused to place the measure on the ballot the following year, and the plaintiffs sought another writ of mandamus. The Ohio Supreme Court granted the writ, and the municipal charter amendment was placed on the ballot, although it did not pass. *State ex rel. Khumprakob v. Mahoning Cnty. Bd. of Elections*, 109 N.E.3d 1184, 1186 (Ohio 2018). Frackfree tried again later that year and the board certified the measure for the ballot.

Plaintiffs Markie Miller and Bryan Twitchell are members of Toledoans for Safe Water and sought to amend Toledo's municipal charter with the Lake Erie Bill of Rights, which provided a legal basis for citizen intervention to protect the Lake Erie watershed. The Lucas County Board of Elections determined that the initiative was beyond Toledo's authority to enact and refused to place it on the ballot. The plaintiffs sought a writ of mandamus, which the Ohio Supreme Court

denied. *State ex rel. Twitchell v. Saferin*, 119 N.E.3d 365, 367 (Ohio 2018) (citing *Flak*, 95 N.E.3d at 332), *abrogated by Maxcy*, 122 N.E.3d at 1165.

Shortly thereafter, the Ohio Supreme Court abrogated *Flak*, holding that "boards of elections have no authority to review the substance of a proposed municipal-charter amendment." *Maxcy*, 122 N.E.3d at 1169. *Maxcy* explained that *Flak* had "mistakenly conflated" the amendment of municipal *charters* with the passing of municipal *ordinances* via initiative. *Id.* If a petition to amend a municipal charter contains enough signatures, then the municipality's governing body must "provide by ordinance for the submission of the proposed amendment to the electors." *Id.* at 1171. "And once the legislative body of the municipality passes an ordinance placing the proposed charter amendment on the ballot, the duty of the board [of elections] is to simply add the proposed charter amendment to the ballot." *Id.* In other words, "in placing a proposed amendment to a municipal charter on the ballot, the 'board of elections has nothing but a ministerial role under the [Ohio] Constitution.'" *Id.* (quoting *State ex rel. Semik v. Cuyahoga Cnty. Bd. of Elections*, 617 N.E.2d 1120, 1123 (Ohio 1993) (per curiam)).

After *Maxcy*, the Lucas County Board of Elections placed the proposed municipal charter amendment on the ballot, and it passed. *Drewes Farms P'ship v. City of Toledo*, 441 F. Supp. 3d 551, 554 (N.D. Ohio 2020), *appeal dismissed*, No. 20-3368, 2020 WL 3619934 (6th Cir. Apr. 14, 2020), *and appeal dismissed*, No. 20-3361, 2020 WL 3620205 (6th Cir. May 5, 2020). A federal district court later invalidated the law as "unconstitutionally vague and exceed[ing] the power of municipal government in Ohio." *Id.* at 558.

Plaintiffs Gregory Pace and William Lyons are members of the Columbus Community Rights Group, which proposed a municipal ordinance titled "Community Bill of Rights for Water, Soil and Air Protection and to Prohibit Gas and Oil Extraction and Related Activities and Projects."

The proposed ordinance gave Columbus citizens various environmental rights and regulated oil and gas extraction. The Franklin County Board of Elections determined that the proposed ordinance exceeded Columbus's legislative authority and refused to place the measure on the ballot. The plaintiffs sought a writ of mandamus, which the Ohio Supreme Court denied. *State ex rel. Bolzenius v. Preisse*, 119 N.E.3d 358, 362 (Ohio 2018).

Plaintiffs Gwen Fischer and Damen Rae are members of the Portage Community Rights Group, which petitioned to convert the Portage County government to a charter form. Plaintiff Gregory Howard is a member of the Meigs County Home Rule Committee, which proposed a county charter for Meigs County. The boards of elections in both counties concluded that the proposed charters failed to adequately provide for county executive positions and refused to place them on the ballot. *Coover*, 70 N.E.3d at 589. The plaintiffs filed protests with the secretary of state, who concluded that the petitions were properly excluded from the ballot because they failed to provide for all duties imposed on county officers. The plaintiffs sought writs of mandamus, which the Ohio Supreme Court denied because the language in the proposed charters was "insufficient" to provide for appropriate powers of county officers. *Id*. at 591.

Plaintiffs Saraquoia Bryant and Sally Jo Wiley are members of the Athens Community Bill of Rights Committee, which proposed a county charter containing prohibitions on hydraulic fracturing and waste injection. After the Athens County Board of Elections refused to place the proposed county charter on the ballot, the plaintiffs filed a protest with the secretary of state. The secretary upheld the board's decision because the proposed charter failed to provide for the election and appointment of a county executive and the state had preemptive authority to regulate oil and gas operations. The plaintiffs sought a writ of mandamus, which the Ohio Supreme Court denied.[5]

---

[5] The Ohio Supreme Court held that the secretary of state did not have the authority "to invalidate charter petitions based upon his assessment of the legality or constitutionality of the measure if enacted," but denied the writ of

*Walker*, 43 N.E.3d at 422–23, 425. Twice more the board refused to certify the proposed charter, and the Ohio Supreme Court denied the plaintiffs' writs of mandamus because the proposed charter's "language is insufficient to provide for the exercise of all powers vested in, and the performance of all duties imposed upon, counties and county officers." *Coover*, 70 N.E.3d at 591; *see also State ex rel. McGinn v. Walker*, 87 N.E.3d 204, 208 (Ohio 2017) ("The Athens County charter petition is nearly indistinguishable from the language we rejected in *Walker* and *Coover*.").

Plaintiffs Katharine Jones and Gerald Dolcini are members of Sustainable Medina County, which submitted petitions to convert the Medina County government to a charter form. After the Medina County Board of Elections certified the charters, the secretary of state determined that the proposed charters did not provide an adequate description of the form of proposed county government and instructed the board of elections not to place them on the ballot. The Ohio Supreme Court denied the plaintiffs' writ of mandamus, concluding that it was within the secretary's "discretion to determine that the proposed charters were invalid because they did not set forth the form of government." *Walker*, 43 N.E.3d at 425.

The next year, the Medina County Board of Elections tied over whether to certify the proposed charter. The secretary of state rejected the charter because it did not provide for all duties imposed on county officers. The Ohio Supreme Court denied the plaintiffs' writ of mandamus because they failed to pursue an appropriate remedy by either formally protesting the board's decision or requesting that the board bring an action in a common pleas court. *State ex rel. Jones v. Husted*, 65 N.E.3d 733, 736 (Ohio 2016). The plaintiffs pursued the charter the following year, and the board voted against certification because the proposal again failed to adequately provide for the form of county government. The secretary of state declined to rule on the plaintiffs' protest

---

mandamus because the secretary "presented an alternative basis for invalidating the charter petitions, namely, that the charters do not satisfy the threshold requirements that define a charter initiative." *Walker*, 43 N.E.3d at 425.

"because he believed that the petitioners were precluded from protesting further by having contemporaneously pursued the O.R.C. § 307.94 common pleas hearing option." DE 1, Compl., Page ID 47. The Ohio Supreme Court again denied the plaintiffs' writ of mandamus, concluding that the board properly excluded the proposed charter because it did not provide for the exercise of all powers and duties imposed on county officers. *McGinn*, 87 N.E.3d at 209.

In this action, the plaintiffs sued the Ohio secretary of state, Frank LaRose, in his official capacity, and members of the seven different county boards of elections (Athens, Franklin, Lucas, Mahoning, Medina, Meigs, and Portage counties) in their official capacities, under 42 U.S.C. § 1983, alleging numerous constitutional violations. The plaintiffs argue that the Initiative Authority Statutes' prescreening process violates the First, Fourteenth, and Ninth Amendments, as well as the Ohio Constitution's separation of powers. The plaintiffs sought declaratory relief and to enjoin the defendants from carrying out the required prescreening process.

The district court dismissed the case in several decisions.[6] *Beiersdorfer v. LaRose*, 397 F. Supp. 3d 1037, 1053 (N.D. Ohio 2019) (*Beiersdorfer I*); *Beiersdorfer v. LaRose*, No. 4:19-CV-260, Mem. Op. & Order, ECF 77, at Page ID 927 (N.D. Ohio Dec. 31, 2019) (*Beiersdorfer II*); *Beiersdorfer v. LaRose*, No. 4:19-CV-260, 2020 WL 2085140, at *8 (N.D. Ohio Apr. 30, 2020) (*Beiersdorfer III*). The district court held that the plaintiffs lacked standing to pursue their claims against the Mahoning County defendants, and that the state separation of powers claim was barred by sovereign immunity. *Beiersdorfer I*, 397 F. Supp. 3d at 1047–48, 1053; *Beiersdorfer II*, No. 4:19-CV-260, ECF 77, at Page ID 926; *Beiersdorfer III*, 2020 WL 2085140, at *8. The court also held that the initiative statutes did not violate the First, Fourteenth, or Ninth Amendments.

---

[6] LaRose and the members of the county boards of elections of Mahoning County, Portage County, Franklin County, Athens County, and Meigs County filed motions to dismiss for lack of subject matter jurisdiction and failure to state a claim. Fed. R. Civ. Pro. 12(b)(1), 12(b)(6). Members of the Lucas County Board of Elections and the Medina County Board of Elections filed motions for judgment on the pleadings. Fed. R. Civ. Pro. 12(c).

The plaintiffs appealed. LaRose petitioned for initial en banc hearing, arguing that the First Amendment is inapplicable to laws regulating the initiative process. This court denied the petition.

II.

We review the denial of a motion to dismiss for lack of subject matter jurisdiction de novo. *Rote v. Zel Custom Mfg. LLC*, 816 F.3d 383, 387 (6th Cir. 2016). "Motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). When, as here, the defendants make a facial "challenge to the sufficiency of the pleading itself," we "must take the material allegations of the petition as true and construed in the light most favorable to the nonmoving party." *Id*.

We also review the district court's order granting a Rule 12(b)(6) motion to dismiss de novo. *Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 793 (6th Cir. 2016). We use the same standard of review for a judgment on the pleadings granted pursuant to Rule 12(c). *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007). "We construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and examine whether the complaint contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Solo*, 819 F.3d at 793 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted)).

We may also "consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment." *Com. Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007); *see also United States v. Harris*, 331 F.2d 600, 601 (6th Cir. 1964) (appellate court can take judicial notice sua sponte). We may "take judicial notice of developments in related 'proceedings in other courts of record.'" *Chase Bank USA, N.A. v. City*

*of Cleveland*, 695 F.3d 548, 553 n.2 (6th Cir. 2012) (quoting *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 972 n.5 (6th Cir. 2005)).

### III.

The plaintiffs do not challenge the dismissal of the claims against the Mahoning County defendants for lack of standing, so the issue is abandoned. *United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006) ("[A]n appellant abandons all issues not raised and argued in its initial brief on appeal." (quoting *United States v. Still*, 102 F.3d 118, 122 n.7 (5th Cir. 1996))). Therefore, we also dismiss plaintiffs Beiersdorfer and Hunter for lack of standing.[7] *Hollingsworth v. Perry*, 570 U.S. 693, 705, 707 (2013) ("To have standing, a litigant must . . . possess a direct stake in the outcome of the case . . . that is distinguishable from the general interest." (internal citations and quotations omitted)). Beiersdorfer and Hunter have not alleged that they are involved in the pursuit of initiatives in the other defendant counties and thus fail to allege a concrete and personalized injury-in-fact necessary to sustain standing against the remaining defendants.

### IV.

Neither the district court nor the parties addressed whether the plaintiffs have standing to sue the Lucas County defendants. However, "we are required in every case to determine—sua sponte if the parties do not raise the issue—whether we are authorized by Article III to adjudicate the dispute." *Chapman v. Tristar Prod., Inc.*, 940 F.3d 299, 304 (6th Cir. 2019). "Standing is 'the threshold question in every federal case,'" *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)), and "[w]e may not decide the merits of a claim for relief unless some party pressing the claim has standing to bring it." *Chapman*, 940 F.3d at 304. The plaintiffs lack standing to sue the Lucas County defendants because the initiative

---

[7] Beiersdorfer and Hunter did not have standing when they commenced the case. *See Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 68 n.22 (1997); *Graveline v. Benson*, 992 F.3d 524, 532 (6th Cir. 2021).

statutes do not apply to the process to amend municipal charters, and the plaintiffs do not allege that they have ever pursued or intend to pursue the forms of initiative in Lucas County to which the prescreening process does apply.

A plaintiff must satisfy three elements for standing: "(1) that he has suffered an 'injury in fact,' (2) that there is a 'causal connection between the injury and the conduct complained of,' and (3) that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Kiser v. Reitz*, 765 F.3d 601, 607 (6th Cir. 2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). To establish injury in fact, the plaintiff must demonstrate that "he personally has suffered some actual or threatened injury as a result of the allegedly illegal conduct of the defendant." *Coyne*, 183 F.3d at 494 (internal quotations omitted).

When seeking "declaratory and injunctive relief, a pre-enforcement challenge may be made before the actual completion of an injury in fact." *Grendell v. Ohio Supreme Ct.*, 252 F.3d 828, 832 (6th Cir. 2001). But the "plaintiff must show actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review." *Id.* (*quoting Nat'l Rifle Assoc. of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997)). "Past exposure to illegal conduct does not in itself show a present case or controversy . . . if unaccompanied by any continuing, present adverse effects." *Lujan*, 504 U.S. at 564 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).

The plaintiffs allege that the Lucas County Board of Elections "improperly reviewed the substance" of their proposed municipal charter amendment—the Lake Erie Bill of Rights—when the board refused to place the measure on the ballot in 2018. DE 1, Compl., Page ID 36. But the plaintiffs were successful in placing the Lake Erie Bill of Rights on the ballot the following year, and the charter amendment passed with sixty percent of the vote. *Drewes Farms P'ship*, 441 F.

- 11 -

Supp. 3d at 554.[8]  Therefore, any injury arising from board's refusal to place the proposed charter amendment on the ballot had already been redressed when the plaintiffs commenced this case.[9] That refusal cannot alone serve as a valid basis for standing.

Nor have the plaintiffs demonstrated the existence of "continuing, present adverse effects" necessary to confer standing as to their claims for prospective relief.  *Lujan*, 504 U.S. at 564 (quoting *Lyons*, 461 U.S. at 102).  In the district court, the Mahoning County plaintiffs said that the board's actions "have a severe deterrent effect" and that the plaintiffs' "core political speech rights [are] chilled, when . . . forced to put even more resources toward defending proposed ballot measures in court in an effort to get them on the ballot."  DE 48, Opp. to Mahoning Cnty. Mot. to Dismiss, Page ID 463.  Assuming that the plaintiffs would make the same argument as to the Lucas County defendants, "the mere fact" that they "feel[] inhibited" "does not objectively establish an imminent threat that chills protected activity."  *Grendell*, 252 F.3d at 835.  The plaintiffs do not argue that the Lucas County defendants have prescreened any charter amendments after *Maxcy* or that the defendants have threatened to exclude any measure from the ballot.

The Ohio Supreme Court made clear in *Maxcy* that "boards of elections have no authority to review the substance of a proposed municipal-charter amendment."  *Maxcy*, 122 N.E.3d at 1169. If a petition to amend a municipal charter gains enough signatures, then the municipality's governing body passes an ordinance ordering the board of elections to place the charter amendment

---

[8] A federal district court later invalidated the law as "unconstitutionally vague and exceed[ing] the power of municipal government in Ohio."  *Id*. at 558.

[9] The Lucas County Board of Elections certified the Lake Erie Bill of Rights for placement on the ballot on December 20, 2018, more than a month before the plaintiffs filed their complaint.  *See State ex rel. Abernathy v. Lucas Cty. Bd. of Elections*, 125 N.E.3d 832, 834 (Ohio 2019) (per curiam); Relator's Evidence at 1, *Abernathy*, 125 N.E.3d 832 (No. 2018-1824), available online at http://supremecourt.ohio.gov/pdf_viewer/pdf_viewer.aspx?pdf=859135.pdf.  Plaintiff Twitchell motioned to intervene as respondent in *Abernathy*, which the Ohio Supreme Court granted.  Mot. to Intervene, *Abernathy*, 125 N.E.3d 832 (No. 2018-1824) (Dec. 27, 2018), available online at http://supremecourt.ohio.gov/pdf_viewer/pdf_viewer.aspx?pdf=858982.pdf; Order Granting Mot. to Intervene, *Abernathy*, 125 N.E.3d 832 (No. 2018-1824) (Dec. 31, 2018), available online at https://supremecourt.ohio.gov/rod/docs/pdf/0/2018/2018-ohio-5310.pdf.

on the ballot. *Id.* at 1171. At that point, "the board of elections has nothing but a ministerial role" and must "simply add the proposed charter amendment to the ballot." *Id*. (quoting *Semik*, 617 N.E.2d at 1123). The Ohio Supreme Court has since reiterated that the Lucas County "[B]oard [of Elections] had no power to keep the proposed charter amendment off the ballot for any reason." *State ex rel. Abernathy v. Lucas Cnty. Bd. of Elections*, 125 N.E.3d 832, 836 (Ohio 2019).

The plaintiffs allege that after *Maxcy*, "using Ohio's unconstitutional ballot access scheme . . . a single individual filed a protest to keep the [Lake Erie Bill of Rights] off of the ballot, thereby subjecting Plaintiffs to more costly and time consuming litigation in an effort to place the [Lake Erie Bill of Rights] on the ballot." DE 1, Compl., Page ID 37. But the plaintiffs do not allege that the Lucas County Board of Elections actually prescreened the charter amendment. In fact, the board rejected the protest to placing the amendment on ballot, despite the board's professed belief that the measure was "unconstitutional and unenforceable," because *Maxcy* "obliged [the board] to vote to place the measure on the ballot." *Abernathy*, 125 N.E.3d at 834. The Ohio Supreme Court subsequently denied a writ of mandamus to the opponent of the charter amendment because he was "not entitled to a writ of prohibition to undo" the board's "perform[ance] [of] its ministerial duty" of placing the amendment on the ballot. *Id*. at 836. The Lake Erie Bill of Rights was submitted to the electorate in 2019 and passed with sixty percent of the vote. *Drewes Farms P'ship*, 441 F. Supp. 3d at 554. The plaintiffs cannot show that an injury is "certainly impending," particularly "when, as here, the plaintiff[s] allege[] only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff[s'] own control." *Lujan*, 504 U.S. at 564 n.2. In sum, there is no live case or controversy pertaining to the board's prescreening of municipal charter amendments.

The plaintiffs also do not raise the possibility that they have ever pursued county-charter or municipal-ordinance initiatives (to which the initiative statues apply) in Lucas County, or that they ever plan to pursue those forms of initiative in the future. The Supreme Court has made clear that generalized statements of future intent do not suffice to ground standing. *See Carney v. Adams*, 141 S. Ct. 493, 502–03 (2020); *Lujan*, 504 U.S. at 564 ("Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." (citation omitted)). Plaintiffs allege no such future intent, let alone a concrete one.

Without more, the plaintiffs have not shown a particularized interest against the Lucas County Board of Elections defendants "that is distinguishable from the general interest" of every eligible voter in the county. *Hollingsworth*, 570 U.S. at 707. Instead, the complaint against the Lucas County defendants amounts to a "'generalized grievance' . . . insufficient to confer standing." *Id*. at 706. Therefore, we dismiss the plaintiffs' claims against the Lucas County defendants for lack of standing. Because plaintiffs Miller and Twitchell have not alleged that they seek to pursue initiative efforts in any county other than Lucas County, they must also be dismissed for lack of standing.

Nine plaintiffs (Bryant, Wiley, Jones, Dolcini, Fischer, Rae, Howard, Lyons, and Pace), five defendant county boards of elections (Athens, Franklin, Medina, Meigs, and Portage), and the secretary of state remain.

V.

The plaintiffs argue that the Initiative Authority statutes impose a prior restraint and alternatively fail *Anderson-Burdick* scrutiny. Because the laws do neither, the plaintiffs have failed to make out a plausible First Amendment violation.

A.

The plaintiffs argue that the Initiative Authority Statutes constitute a "prior restraint forbidden by the First Amendment." CA6 R. 42, Appellants' Br., at 27. We have previously rejected the argument that the Initiative Authority Statutes impose a prior restraint on political speech. *Schmitt*, 933 F.3d at 637–39.

In *Schmitt*, the plaintiffs sought to place municipal-ordinance initiatives on the ballot that effectively decriminalized marijuana possession. *Id*. at 635. The Portage County of Board of Elections declined to certify the measure for placement on the ballot because the board concluded that it was administrative rather than legislative. *Id*. Instead of seeking mandamus, the plaintiffs sought and obtained an injunction in federal district court. *Id*. at 634. We reversed, concluding that the initiative process did not violate the United States Constitution. *Id*. at 634, 642.

Importantly, *Schmitt* held that "the ballot-initiative process . . . is not a prior restraint." *Id*. at 638. "The fundamental objection to systems of prior restraint is that they create a risk of government censorship of expressive activity," but "Ohio's ballot-initiative laws, in contrast, do not directly restrict core expressive conduct." *Id*. Instead, "the laws regulate the process by which initiative legislation is put before the electorate, which has, at most, a second-order effect on protected speech." *Id*. We concluded that "[r]egulations like these are 'a step removed from the communicative aspect' of core political speech, and therefore do not involve the same risk of censorship inherent in prior-restraint cases." *Id*. (quoting *John Doe No. 1 v. Reed*, 561 U.S. 186, 213 (2010) (Sotomayor, J., concurring)). "[B]allots serve primarily to elect candidates, not as forums for political expression." *Id*. (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363 (1997)).

The plaintiffs argue that this case is distinguishable because the *Schmitt* plaintiffs did not challenge the boards of elections' authority to prescreen proposed initiatives, but the plaintiffs here challenge "the discretion accorded election officials to veto a proposal based on its substance." CA6 R. 42, Appellants' Br., at 29–30. It is true that the *Schmitt* plaintiffs did "not challenge Ohio's ability to limit the subject matter of its initiatives" and instead focused on "the asserted inadequacy of the review afforded to the boards' discretionary judgments." *Schmitt*, 933 F.3d at 640 n.3. But the *Schmitt* plaintiffs asserted that the initiative statutes "amount[ed] to a prior restraint . . . because the ballot-initiative statutes delegate authority to boards of elections to review proposed initiatives prior to the election." *Id*. at 638. The *Schmitt* plaintiffs thus made the same argument that the plaintiffs are making here: that the initiative statutes are a prior restraint because the boards of elections may review proposed initiatives before an election. We already decided in *Schmitt* that the statutes did not impose a prior restraint and thus come to the same conclusion here.[10]

B.

"[O]ur precedent dictates that we evaluate First Amendment challenges to nondiscriminatory, content-neutral ballot initiative requirements under the *Anderson-Burdick* framework."[11] *Thompson v. Dewine*, 959 F.3d 804, 808 (6th Cir. 2020); *see also Schmitt*, 933 F.3d at 639 (applying *Anderson-Burdick* when reviewing challenge to same Ohio initiative laws). We recognize that our sister circuits are divided on the issue of whether the First Amendment applies to laws governing the process by which legislation is enacted. *See Schmitt*, 933 F.3d at 646–48 (Bush, J., concurring in part) (collecting cases). But "until this court sitting en banc takes up the

---

[10] Although the plaintiffs do not raise this point, only municipal-ordinance initiatives were at issue in *Schmitt*, not county-charter initiatives. But the plaintiffs' argument in *Schmitt* that the prescreening process itself constitutes a prior restraint—and our rejection of that argument—apply with equal measure to county-charter initiatives.

[11] *See*, *infra*, Section V.C (concluding that the statutory scheme is not content based).

question of *Anderson-Burdick*'s reach, we will apply that framework in cases like this." *Dewine*, 959 F.3d at 808 n.2.

Under the *Anderson-Burdick* framework, we "weigh the character and magnitude of the burden" that the rule imposes on the plaintiff's First Amendment rights "against the interests the [s]tate contends justify that burden, and consider the extent to which the [s]tate's concerns make the burden necessary." *Schmitt*, 933 F.3d at 639 (quoting *Timmons*, 520 U.S. at 358). First, we "consider the severity of the restriction." *Id*. We subject laws imposing "severe burdens" to strict scrutiny, while "lesser burdens . . . trigger less exacting review," and the state's "important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id*. (omission in original). "Regulations that fall in the middle 'warrant a flexible analysis that weighs the state's interests and chosen means of pursuing them against the burden of the restriction.'" *Id*. (quoting *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016)). Second, "we identify and evaluate the state's interests in and justifications for the regulation." *Id*. And third, "we assess the legitimacy and strength of those interests and determine whether the restrictions are constitutional." *Id*. (citation and internal quotation marks omitted).

The plaintiffs argue that the Initiative Authority Statues should be subject to strict scrutiny because the laws impose a "severe burden" by "exclud[ing] proposed initiatives from the ballot." CA6 R. 42, Appellants' Br., at 14–15. "The hallmark of a severe burden is exclusion or virtual exclusion from the ballot." *Grimes*, 835 F.3d at 574.[12] But the plaintiffs are not faced with exclusion from the ballot, virtual or otherwise. The proposed county-charter initiatives were rejected because they failed to list the required county positions. And the only proposed municipal-

---

[12] Also relevant in determining the severity of the burden is an assessment of whether the law is content neutral or provides alternate means of access. *Daunt v. Benson*, 956 F.3d 396, 407–08 (6th Cir. 2020); *Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 921 (6th Cir. 1998) (citing *Burdick v. Takushi*, 504 U.S. 428, 437–38 (1992)). For the reasons explained in Section V.C *infra*, the Initiative Authority Statutes are content neutral.

ordinance initiative at issue—that advanced by plaintiffs Pace and Lyons in Franklin County—was rejected because it was not legislative action. *See Bolzenius*, 119 N.E.3d at 362. The plaintiffs remain free to exercise the initiative power in compliance with Ohio's Initiative Authority Statutes. And the plaintiffs do not provide a coherent explanation of how the moderate requirements for initiatives prevent them from accessing the ballot.

The plaintiffs argue that they are excluded from the ballot because the boards of elections, secretary of state, and Ohio Supreme Court continuously shift the standards on the requirements for proposed initiatives, "consign[ing] the people to an endless and egregious guessing game of what proposal, if any, could possibly please enough BOE members and the Secretary of State to get on the ballot." CA6 R. 42, Appellants' Br., at 22. Specifically, the plaintiffs allege that their petitions were rejected for failing to propose a unitary executive, which they assert Ohio law does not require, and "because of arbitrarily shifting views of whether Ohio 'general law' could be incorporated by reference into charter proposals to define county governmental officers' duties." *Id*. at 20–21. The plaintiffs also allege that the proposed charters in Athens and Medina were repudiated "for opposite ways of representing the duties of public officials." *Id*. at 20. These allegations misread Ohio law and decisions of the Ohio Supreme Court.[13]

The plaintiffs offer no citation to Ohio law for their claim that a county charter does not require an executive position. Nor could they, because Ohio law requires that "[a]n alternative form of county government shall include either an elective county executive . . . or an appointive county executive." Ohio Rev. Code Ann. § 302.02; *see also* Ohio Const. art. X, § 3 ("Every

---

[13] *See Iqbal*, 556 U.S. at 678 ("Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007))); *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987) ("[W]e need not accept as true legal conclusions or unwarranted factual inferences.").

[county] charter shall provide the form of government of the county and shall determine which of its officers shall be elected and the manner of their election."); *Walker*, 43 N.E.3d at 425.

The plaintiffs allege that the Ohio Supreme Court "irrational[ly]" refused to grant mandamus to the Medina County plaintiffs because the proposed charter did not include a "catch-all" provision that incorporated Ohio general law by reference into the proposed charter, which was "directly contrary" to its past decisions holding that the charter "must contain everything within its four corners." DE 1, Compl., Page ID 48. Those allegations are contradicted by the decisions of the Ohio Supreme Court. The proposed charters in Medina and Athens County were first rejected because they did "not 'provide the form of government of the county' or 'determine which of its officers shall be elected and the manner of their election.'" *Walker*, 43 N.E.3d at 425 (quoting Ohio Const. art X, § 3). The proposed charters included only the following statement:

> The offices and duties of those offices, as well as the manner of election to and removal from County offices, and every other aspect of county government not prescribed by this Charter, or by amendments to it, shall be continued without interruption or change in accord with the Ohio Constitution and the laws of Ohio that are in force at the time of the adoption of this Charter and as they may subsequently be modified or amended.

*Id.* The Ohio Supreme Court held that the statement was insufficient because it required one to "look to sources outside the proposed charters to determine the form of government they purport to establish." *Id.*

The proposed charters in Athens, Meigs, and Portage Counties contained similar language:

> The County . . . is responsible within its boundaries for the exercise of all powers vested in, and the performance of all duties imposed upon, counties and County officers by general law. . . . When not prescribed by the Charter or by amendment to this Charter, by local law enacted by the County Commissioners, or by local law enacted by the people, such powers shall be exercised in the manner prescribed by the Constitution of Ohio or by general law.

*Coover*, 70 N.E.3d at 590 (omission in original). The Ohio Supreme Court likewise concluded that, "[a]s in *Walker*, the powers and duties are not individually delineated, forcing one to 'look to

sources outside the proposed charters to determine the form of government they purport to establish, and therefore they do not satisfy the legal prerequisites.'" *Id*. at 591 (quoting *Walker*, 43 N.E.3d at 425).

The next attempt to pass a county charter in Athens County failed because it contained "the same language [the Ohio Supreme Court] deemed inadequate in *Coover*." *McGinn*, 87 N.E.3d at 208. The subsequent proposed charter for Medina County came "close," but likewise failed to "provide for the exercise of *all* powers, and the performance of *all* duties, imposed on counties and county officers by law." *Id*. at 209. While the proposal correctly listed all the positions, it failed to provide for all the powers of the county prosecuting attorney required by state law.[14] *Id*.

The *McGinn* plaintiffs attempted to rectify that oversight through a "catch-all provision" similar to the language that the Ohio Supreme Court had rejected in *Coover*.[15] *Id*. The Ohio Supreme Court did not, contrary to the plaintiffs' assertions, state that such a catch-all provision was necessary to save the charter. Rather, the Ohio Supreme Court merely pointed out that such a provision was not in Medina's proposed charter at all; instead, the provision was in the proposed charter for *Athens* County. The Ohio Supreme Court did not say that had the *Medina* charter included the provision, it would have sufficed to provide for the missing county attorney powers. So, contrary to the plaintiffs' assertions, the Ohio Supreme Court in *McGinn* did not reverse its conclusion in *Walker* and *Coover* that "[p]roposed charters do not satisfy Article X, Section 3 of

---

[14] Ohio law requires that county prosecuting attorneys serve as the legal advisor to various county officers, Ohio Rev. Code Ann. § 309.09(A), but the proposed charter did not impose that duty and did not "identif[y] another official to whom these responsibilities have been transferred." *McGinn*, 87 N.E.3d at 209. Likewise, Ohio law authorizes prosecuting attorneys to pay rewards to informants who supply drug-related tips, Ohio Rev. Code Ann. § 309.08(B), and to bring suit on behalf of the state to prevent the misappropriation of public funds, *id*. § 309.12, but "[t]he proposed charter for Medina County contain[ed] no equivalent grant of authority." *McGinn*, 87 N.E.3d at 209.

[15] "When not prescribed by the Charter or by amendment to this Charter, by local law enacted by the County Commissioners, or by local law enacted by the people, [all powers exercised by the people through their county government] shall be exercised in the manner prescribed by the Constitution of Ohio or by general law." *Id*. (alteration in original).

the Ohio Constitution if '[o]ne must look to sources outside the proposed charters to determine the form of government they purport to establish.'" *Id*. at 208 (quoting *Walker*, 43 N.E.3d at 425).

Finally, decisions of the Ohio Supreme Court refute the plaintiffs' assertion that the proposed charters in Athens and Medina County were repudiated "for opposite ways of representing the duties of public officials." CA6 R. 42, Appellants' Br., at 20. The plaintiffs' first attempt at charters in both counties contained identical language that the Ohio Supreme Court concluded failed to provide for any duties of county officials. *Walker*, 43 N.E.3d at 425. The subsequent Athens and Medina charters were certainly different in *McGinn*, but not "opposite." The Ohio Supreme Court rejected the Athens County charter because while it provided for the election of eight county officials, it did not specify the powers and duties of those officials. *McGinn*, 87 N.E.3d at 208. And, as already discussed, the Ohio Supreme Court rejected the Medina County charter because it failed to provide for all the powers of the county attorney, even though it contained much more detail than the proposed Athens County charter. *Id*. at 209. Thus, both charters failed because they did not include all the powers and positions required by state law.

In short, the plaintiffs failed to succeed in placing their measures on the ballot not because of "shifting standards," but because they failed to comply with the basic requirements of Ohio law. Preventing initiatives that do not comply with the state-law requirements involved here from reaching the ballot is not a severe burden on the plaintiffs' First Amendment rights. As the Court stated in *Burdick*, the "assumption that an election system that imposes any restraint on voter choice is unconstitutional . . . is simply wrong." *Burdick v. Takushi*, 504 U.S. 428, 440 n.10 (1992); *see also id*. ("[L]imiting the choice of candidates to those who have complied with state election law requirements is the prototypical example of a regulation that, while it affects the right to vote, is eminently reasonable."); *Anderson v. Celebrezze*, 460 U.S. 780, 792 n.12 (1983)

- 21 -

("Although a disaffiliation provision may preclude such voters from supporting a particular ineligible candidate, they remain free to support and promote other candidates who satisfy the State's disaffiliation requirements.").

While the burden is not severe, we concluded in *Schmitt* that the burden imposed by the Ohio initiative statutes "is not so minimal as to warrant rational-basis review" because the "boards of elections wield the discretionary authority to decline to certify initiatives, and the burden thus falls on the aggrieved proponent to obtain mandamus relief in order to vindicate his or her interest." *Schmitt*, 933 F.3d at 641. The same point applies here. The burden is "moderate." Almost all of the defendants do not contest that "the burden imposed by the Ohio ballot-initiative process is somewhere between minimal and severe," requiring this court to "engage in a flexible analysis in which we weigh the 'burden of the restriction' against the 'state's interests and chosen means of pursuing them.'" *Id*. (quoting *Grimes*, 835 F.3d at 574).

Given the moderate burden, the second step of *Anderson-Burdick* considers "the state's interests in and justifications for the regulation." *Id*. at 639. In *Schmitt*, we recognized that "[t]he Supreme Court has explained that, in structuring elections, 'States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.'" *Id*. at 641 (quoting *Timmons*, 520 U.S. at 358); *see also id*. (quoting *John Doe No. 1*, 561 U.S. at 186 ("The State's interest in preserving the integrity of the electoral process is undoubtedly important."); *Buckley v. Am. Const. Law Found*., 525 U.S. 182, 191 (1999) ("States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process.")). We have recognized strong state interests in "ensuring that its elections are run fairly and honestly," "maintaining the integrity of its initiative process," *Schmitt*, 933 F.3d at 641 (quoting *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 297 (6th Cir. 1993)),

"avoid[ing] overcrowded ballots," and "protect[ing] the integrity of its political processes from frivolous or fraudulent candidacies," *id*. (quoting *Jolivette v. Husted*, 694 F.3d 760, 769 (6th Cir. 2012)). *Schmitt* specifically recognized Ohio's "legitimate and substantial" interests "in ensur[ing] that only ballot-eligible initiatives go to the voters because [k]eeping unauthorized issues off the ballot reduces the odds that an initiative is later held invalid on the ground that the voters exceeded their authority to enact it," as well as Ohio's "interest in maintaining voter confidence in the electoral process." *Id*. (alterations in original) (internal quotations omitted).

The third step of *Anderson-Burdick* considers "whether the State's restrictions are constitutionally valid given the strength of its proffered interests." *Id*. "[W]hen a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions."[16] *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788). In *Schmitt*, we concluded that the "the absence of a statutory de novo appeal of right does not impose a significant or unjustified burden on initiative proponents' First Amendment rights" because the Ohio Supreme Court "performs what is essentially a de novo review of the legal issue." *Schmitt*, 933 F.3d at 642. We held that "[a]lthough the State's chosen method for screening ballot initiatives may not be the least restrictive means available, it is not unreasonable given the significance of the interests it has in regulating elections." *Id*. That the plaintiffs now specifically challenge the prescreening process does not require a different result.

Including initiatives that purport to adopt a county charter (but do not because the proposal failed to designate the required county positions) and a municipal ordinance (but do not because

---

[16] As discussed below, the plaintiffs challenge the fact that Ohio has a prescreening process but not the substantive requirements of that process—that county-charter petitions list all the required county positions and that municipal-ordinance initiatives take legislative action.

the proposal failed to take legislative action) undermines Ohio's asserted interests. Ballots could be flooded with initiatives, any number of which may be defective from the start, and overwhelm voters. As the Seventh Circuit has recognized, "[l]imiting the number of referenda improves the chance that each will receive enough attention, from enough voters, to promote a well-considered outcome." *Jones v. Markiewicz-Qualkinbush*, 892 F.3d 935, 938 (7th Cir. 2018).

The extensive judicial review process afforded by Ohio law also lessens any chance that an initiative will be wrongfully excluded. In addition to review by a court of common pleas and the secretary of state (for county-charter initiatives), the Supreme Court of Ohio regularly considers ballot-access disputes and does so on an expedited timeline. Given the relatively low burden on the plaintiffs, important state interests, and the small risk of injury to First Amendment rights, the Initiative Authority Statutes survive *Anderson-Burdick* scrutiny.

C.

The plaintiffs also appear to argue that strict scrutiny is warranted because the Initiative Authority Statues are content-based restrictions. The plaintiffs assert in passing that the defendants are "enforcing content-based restrictions on the initiative right." CA6 R. 42, Appellants' Br., at 13. In the portion of their brief advocating for strict scrutiny, they make repeated—though often conclusory—assertions that the challenged laws are content based, allow for "substantive" review, and give board of elections officials unfettered discretion to decide what kind of ideas may reach the voting public via ballot initiatives. But much of this section takes a misplaced focus by arguing that the challenged laws are inconsistent with 100 years of Ohio law purportedly forbidding pre-election review of the substance of a ballot initiative. As to the First Amendment, the plaintiffs' opening brief cites no federal cases describing the relevant distinction between content based and content neutral laws under the First Amendment, nor explains how, under those cases,

the laws discriminate based on content. The plaintiffs also address content discrimination in reply, where they allege "content problems rang[ing] from petitioners' supposed dereliction in failing to delineate all statutory powers county officials [have] under a charter system" to "inclusion of petition language that prohibits oil and gas extraction, supposedly unenforceable because of pre-emptive state law."[17] CA6 R. 81, Reply, at 9–10. Though conclusory and presented in a misguided way, we nonetheless now address the plaintiffs' argument—to the extent they make one—that the laws are content based.

The prescreening process—requiring county-charter petitions to include all required county positions and municipal-ordinance petitions to take legislative, not administrative action— is content neutral. In *Schmitt*, we declined to consider the plaintiffs' "attempt to invoke strict scrutiny on the ground that the ballot-initiative statutes are content-based restrictions" because the plaintiffs failed to raise the argument before the district court. *Schmitt*, 933 F.3d at 640 n.3. But we also said that "the mere fact that the legislative-administrative distinction is directed to the content of an initiative does not necessarily make it content based such that it triggers strict scrutiny" and noted that "[t]he rule applies without regard to the subject matter or viewpoint of the initiative." *Id*. We agree with that assessment.

In another case, we upheld an Ohio law preventing initiative petitions from containing more than one proposal. *Comm. to Impose Term Limits on Ohio Supreme Ct. & to Preclude Special Legal Status for Members & Emps. of Ohio Gen. Assembly v. Ohio Ballot Bd.*, 885 F.3d

---

[17] This second example of supposed content discrimination flies in the face of the complaint and the Ohio Supreme Court cases cited therein. True, the secretary of state upheld the Athens County Board of Election's invalidation of the proposed charter in part because the state had preemptive authority to regulate oil and gas. But the Ohio Supreme Court clarified that the secretary did not have the authority "to invalidate charter petitions based upon his assessment of the legality or constitutionality of the measure if enacted." *Walker*, 43 N.E.3d at 425. Mandamus was ultimately not warranted because the secretary "presented an alternative basis for invalidating the charter petitions:" that the proposed charter failed to provide for a county executive. *Id*. Thus, the state judicial review process has already confirmed that this supposed content discrimination was improper, and the plaintiffs do not allege that the county boards of elections or the secretary of state have continued to improperly consider preemptive authority.

443, 445 (6th Cir. 2018). The rule was "not content based" because it applied "to all initiative petitions, no matter the topic discussed or idea or message expressed" and was not "adopted by the government because of disagreement with the message of any initiative petition." *Id*. at 447. Moreover, the rule could "be justified without reference to the content of any initiative petitions" because it "afford[ed] the voters freedom of choice and prevent[ed] 'logrolling.'" *Id*. (quoting *State ex rel. Ohio Liberty Council v. Brunner*, 928 N.E.2d 410, 418 (Ohio 2010)).

Likewise, the Initiative Authority Statutes are not content based because they apply "to all initiative petitions, no matter the topic discussed or idea or message expressed," and the laws were clearly not "adopted by the government because of disagreement with the message of any initiative petition." *Id*. at 447. The statutes can "be justified without reference to the content of any initiative petitions," *id*., because they "ensur[e] that only ballot-eligible initiatives go to the voters" and "maintain[] voter confidence in the electoral process." *Schmitt*, 933 F.3d at 641. The Ohio courts have provided a clear delineation between legislative and administrative action,[18] and the plaintiffs do not allege that officials have failed to apply that standard or that the standard is unclear. And we have already stated—albeit, in dictum—that this precise legislative-administrative distinction is not content based because it "does not involve core expressive conduct" and "applies without regard to the subject matter or viewpoint of the initiative." *Id*. at 640 n.3.[19]

---

[18] Legislative action "enact[s] a law, ordinance, or regulation," while administrative action "execut[es] a law, ordinance, or regulation already in existence." *Ebersole*, 20 N.E.3d at 684 (quoting *Donnelly*, 233 N.E.2d at 500).

[19] And while it is true that county boards of elections must examine the petition to determine if it complies with relevant state law, the same was true for the challenged scheme in *Ohio Ballot Board*, where an official had to examine each proposal to determine if it contained one or two subjects. 885 F.3d at 445, 447. Additionally, the fact that Ohio provides clear criteria for the relevant determinations lessens the concern that the review process involves the sort of subjective evaluations that might raise First Amendment concerns. The requirement that county charters include county positions, for instance, entails no subjective judgment. And as noted, Ohio provides a clear delineation between "legislative" and "administrative" action that also does not require extensive subjective judgment or discretion.

VI.

The remaining claims are easy to resolve. The district court dismissed the plaintiffs' state separation of powers claim as barred by sovereign immunity. *Beiersdorfer I*, 397 F.Supp.3d at 1053; *Beiersdorfer II*, No. 4:19-CV-260, ECF 77, at Page ID 926; *Beiersdorfer III*, 2020 WL 2085140, at *8. Although the plaintiffs list that decision as one of the issues on appeal, the plaintiffs do not discuss state separation of powers in the argument section of their brief. *See* FRAP 28(a)(8) (appellant's argument section of opening brief must contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"). We have previously "cautioned that '[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived,' and that '[i]t is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.'" *Robinson*, 390 F.3d at 886 (quoting *McPherson*, 125 F.3d at 995–96).

In any event, sovereign immunity clearly bars the state law claim. The plaintiffs sued the secretary of state and the members of the boards of elections in their official capacities, seeking an injunction to enforce state law.[20] Eleventh Amendment immunity does not attach to suits "filed against a state official for purely injunctive relief enjoining the official from violating *federal* law." *Ernst v. Rising*, 427 F.3d 351, 358–59 (6th Cir. 2005) (emphasis added) (citing *Ex parte Young*, 209 U.S. 123, 155–56 (1908)). But "pendent *state* law claims against state officials in their official capacity are barred by the Eleventh Amendment." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521 (6th Cir. 2007) (emphasis added) (citing *Pennhurst State Sch. v. Halderman*, 465 U.S. 89, 117–21 (1984)). "The federal courts are simply not open to such state law challenges to official

---

[20] *See Semik*, 617 N.E.2d at 1122 ("The board of elections is not in any sense a municipal functionary. It is strictly a board and an arm of the state government.").

state action, absent explicit state waiver of the federal court immunity found in the Eleventh Amendment," which the plaintiffs do not allege here. *Id.* The district court correctly dismissed the state law claim without prejudice. *See id.* at 521 & n.5 ("An Eleventh Amendment dismissal of pendent state law claims is properly 'with prejudice' to subsequent *federal court* suit, but it does not by itself preclude a *state court* suit from raising the same claims . . . subject to such state law defenses as might be applicable.").[21]

## VII.

The plaintiffs also argue that the Initiative Authority statutes violate "the right of local community self-government," which they say is a fundamental right protected by the substantive due process clause of the Fourteenth Amendment. CA6 R. 42, Appellants' Br., at 33.[22] But the plaintiffs cite cases addressing only the fundamental right to vote, which is not "the right of local community self-government" that the plaintiffs have identified here. In any event, Supreme Court precedent is clear that "municipalities have no inherent right of self-government which is beyond the legislative control of the state." *Trenton v. New Jersey*, 262 U.S. 182, 187 (1923). Localities are "creature[s] of the state exercising and holding powers and privileges subject to the sovereign will," and "the state may withhold, grant or withdraw powers and privileges as it sees fit." *Id.* We have likewise been clear that "the right to initiative is created by state law and is not a right guaranteed by the federal Constitution." *Austin*, 994 F.2d at 294.

---

[21] At oral argument, plaintiffs' counsel argued for the first time that the Initiative Authority Statutes also violate the separation of powers embodied in the U.S. Constitution. Oral Argument at 12:25–14:23. In addition to being untimely, this argument is wholly without merit. "[D]isputed state laws d[o] not implicate federal separation of powers principles." *Johnson v. Voinovich*, 49 F. App'x 1, 3 (6th Cir. 2002); *see also Dreyer v. People of State of Illinois*, 187 U.S. 71, 84 (1902) ("Whether the legislative, executive, and judicial powers of a state shall be kept altogether distinct and separate . . . is for the determination of the state."); *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 255 (1957) ("[T]he concept of separation of powers embodied in the United States Constitution is not mandatory in state governments.").

[22] The plaintiffs also argued before the district court that enforcement of the initiative statutes constituted "actions that shock the conscience," but the plaintiffs forfeited that argument by failing to pursue it on appeal.

If a state chooses to create an initiative procedure, the state may not "place restrictions on its use that violate the federal Constitution." *Id*. at 295. But the initiative statutes do not violate the First or Ninth Amendments, nor did the plaintiffs assert any other violation of the Fourteenth Amendment. And the plaintiffs' argument that Ohio has long recognized a right to local government is irrelevant to whether the U.S. Constitution protects such a right. The district court correctly dismissed this claim.

## VIII.

The plaintiffs also assert that the Initiative Authority Statutes violate the Ninth Amendment, which they say protects "the right of local, community self-government." CA6 R. 42, Appellants' Br., at 37. We have already held that "the ninth amendment does not confer substantive rights in addition to those conferred by other portions of our governing law." *Gibson v. Matthews*, 926 F.2d 532, 537 (6th Cir. 1991). And, as discussed above, there is no substantive "right of local, community self-government" that the courts may enforce against the states. The district court properly dismissed this claim.

## IX.

We dismiss the claims against the Lucas County defendants for lack of standing. We affirm the dismissal of the state law claim as barred by sovereign immunity, and we affirm the dismissal of the remaining claims because the Initiative Authority Statutes do not violate the First, Fourteenth, or Ninth Amendments.

CHAD A. READLER, Circuit Judge, concurring in part and concurring in the judgment. I concur in full in all but Part V of the thoughtful majority opinion. Simply put, plaintiffs' claims are either nonjusticiable or falter badly on the merits.

As to Part V, while I concur in the majority opinion's bottom-line conclusion that plaintiffs' claims fail, we should not be employing *Anderson-Burdick*'s balancing analysis to apply heightened scrutiny toward content-neutral laws governing the procedural mechanics for state ballot initiatives (sometimes known as "gatekeeper provisions"). We did so just two years ago in *Schmitt v. LaRose*, 933 F.3d 628 (6th Cir. 2019). But our doing so, in retrospect, appears somewhat reflexive. Following a more robust explanation as to why Ohio's rules regarding ballot initiatives are not prior restraints on political speech, the majority opinion in *Schmitt* summarily proceeded to measure Ohio's ballot initiative regime through the lens of the *Anderson-Burdick* framework. *Id.* at 639. Despite the unique contours of the initiative process (as compared to more traditional rules governing a candidate's access to the ballot), the majority opinion justified its approach in just one sentence—observing that "we generally evaluate First Amendment challenges to state election regulations under the three-step *Anderson-Burdick* framework"—accompanied by just one case citation (to a decision that did not concern a ballot initiative). *Id.* (citing *Timmons v. Twin City Area New Party*, 520 U.S. 351, 358 (1997)). To be sure, we have previously referenced the *Anderson-Burdick* framework in employing rational basis review to measure "minimally burdensome and nondiscriminatory" ballot initiative regulations. *Comm. to Impose Term Limits on the Ohio Supreme Court & to Preclude Special Legal Status for Members & Employees of the Ohio General Assembly v. Ohio Ballot Bd.*, 885 F.3d 443, 448 (6th Cir. 2018); *see also Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 297 (6th Cir. 1993). Without elaboration, however, the *Schmitt* majority opinion treated the initiative rule at issue (both there and here) as a

typical "state election regulation[]" subject to heightened scrutiny under a general *Anderson-Burdick* balancing test. 933 F.3d at 639. In doing so, the majority opinion paid no heed to the lengthy concurring opinion urging a different path. *See id.* at 642–51 (Bush, J., concurring in part and in the judgment). And it failed to explain why we parted ways with the majority of our sister circuits to consider the issue—the Second, Seventh, Eighth, Tenth, and D.C. Circuits among them—all of whom reject *Anderson-Burdick*'s heightened scrutiny as the appropriate test for challenges to ballot initiative laws, with only the Ninth Circuit having decided otherwise. *Compare Jones v. Markiewicz-Qualkinbush*, 892 F.3d 935, 938 (7th Cir. 2018), *Molinari v. Bloomberg*, 564 F.3d 587, 600 (2d Cir. 2009), *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1099–1100 (10th Cir. 2006) (en banc), *Marijuana Pol'y Project v. United States*, 304 F.3d 82, 84 (D.C. Cir. 2002), *and Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir. 1997), *with Angle v. Miller*, 673 F.3d 1122, 1133 (9th Cir. 2012); *cf. Wirzburger v. Galvin*, 412 F.3d 271, 277 (1st Cir. 2005) (applying intermediate scrutiny to gatekeeper provisions). Nonetheless, *Anderson-Burdick*'s balancing framework is now the standard by which we assess a state's regulation of its initiative process. *See Thompson v. DeWine*, 959 F.3d 804, 808 n.2 (6th Cir. 2020) (per curiam) (explaining that *Schmitt*'s adoption of *Anderson-Burdick* balancing binds future panels addressing ballot initiative regulations absent en banc or Supreme Court intervention).

To my mind, applying a heightened standard of review in this setting is misguided. Because content-neutral regulations governing state ballot initiatives do not touch upon the right to vote, we should apply rational-basis scrutiny in this setting, not *Anderson-Burdick*'s general balancing framework. I understand the Supreme Court's *Anderson-Burdick* jurisprudence to rest on the principle that the First and Fourteenth Amendments grant associational rights to individual candidates and their supporters, which together protect access to the ballot. *See Burdick v. Takushi*,

504 U.S. 428, 433 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983). With that principle in mind, the Supreme Court traditionally has deployed *Anderson-Burdick* in two categories of cases: cases that concern ballot access for political candidates, *see, e.g.*, *Anderson*, 460 U.S. 780 (filing deadlines to appear on a presidential ballot); *Burdick*, 504 U.S. 428 (prohibition on write-in voting); *Timmons*, 520 U.S. 351 (antifusion rule prohibiting candidates from appearing on a ballot as a candidate for multiple parties); and, at *Anderson-Burdick*'s broadest application, cases that concern voting access for individuals, *see Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) (plurality opinion) (voter-identification requirements).

Today's case, however, fits neither category, making *Anderson-Burdick* a particularly poor guide. This case does not concern ballot access for a particular candidate. Nor does it implicate the right to vote. Whatever the contours of that right, nothing in the Constitution requires a state to provide a right to legislate by ballot initiative. *Taxpayers United*, 994 F.2d at 295. Rather, the initiative process is a "wholly state-created right," leaving it subject to whatever "nondiscriminatory, content-neutral limitations" a state wishes to place upon it. *Id.* at 297. Federal courts accordingly "must be mindful of the character of initiatives and referenda. These mechanisms of direct democracy are not compelled by the Federal Constitution. It is instead up to the people of each State, acting in their sovereign capacity, to decide whether and how to permit legislation by popular action." *John Doe No. 1 v. Reed*, 561 U.S. 186, 212 (2010) (Sotomayor, J., concurring).

Constitutional considerations, including the First Amendment, typically will not stand in a state's way when it employs content-neutral procedural rules to structure its elections. As Judge Bush explained in his well-reasoned concurring opinion in *Schmitt*, "[s]tates are free to fashion rules of election mechanics that are content-neutral and do not discriminate against any particular

point of view, including rules that affect the types of matters that may be subject to popular initiatives, without running afoul of the First Amendment." 933 F.3d at 643 (Bush, J., concurring in part and in the judgment). To be sure, laws "that regulate or restrict the communicative conduct of persons advocating a position" in an initiative implicate the First Amendment. *Walker*, 450 F.3d at 1099–1100. But laws (like those at issue here) that merely "determine the process by which legislation is enacted" do not. *Id.*; *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995) (differentiating measures that "control the mechanics of the electoral process" from the "regulation of pure speech"). As opposed to one's speech addressing an initiative's merits, in other words, the First Amendment has little to say about how initiative processes should be structured.

Even if one deems the interests at stake here as touching on some aspect of the right to vote, utilizing *Anderson-Burdick*'s unmoored legal framework to assess a state's ballot initiative process is problematic. *See generally Daunt v. Benson (Daunt I)*, 956 F.3d 396, 422–31 (6th Cir. 2020) (Readler, J., concurring in the judgment); *Daunt v. Benson (Daunt II)*, 999 F.3d 299, 322–33 (6th Cir. 2021) (Readler, J., concurring in the judgment). That framework directs judges to pick two nebulous variables—"interests" and "burdens"—and then weigh them, with unbridled discretion in doing so. *Daunt II*, 999 F.3d at 323–25. By employing such "standardless standards," *Anderson-Burdick* all but invites a judge's personal policy preferences to inform her weighing and balancing. *Id.*; *Daunt I*, 956 F.3d at 424 (Readler, J., concurring in the judgment). That we utilize such an ill-defined framework in cases involving core ballot-access issues is worrisome enough. That our circuit regularly exacerbates that concern by deploying *Anderson-Burdick* in new frontiers far removed from ballot access is doubly concerning. *Daunt I*, 956 F.3d at 423 (Readler, J., concurring in the judgment); *Daunt II*, 999 F.3d at 325–26 (Readler, J., concurring in the judgment) ("Extending the *Anderson-Burdick* framework to any law that ostensibly touches on

'democratic principles' or the 'democratic system' would license unrestrained judicial scrutiny of an endless list of public laws . . . ."). Indeed, we stand alone in our vigorous embrace of *Anderson-Burdick*. *Daunt II*, 999 F.3d at 329–30 (Readler, J., concurring in the judgment) (collecting cases reflecting our outlier status among circuits in the application of *Anderson-Burdick*).

Supreme Court tea leaves suggest we have charted the wrong course, both in *Schmitt* and elsewhere. Last year, the Supreme Court stayed a district court's decision applying *Anderson-Burdick* to declare unconstitutional Idaho's signature requirement law for ballot initiatives. *Little v. Reclaim Idaho*, 140 S. Ct. 2616 (2020); *see also Clarno v. People Not Politicians Or.*, 141 S. Ct. 206 (Aug. 11, 2020) (mem.) (summarily staying district court judgment on a similar question). In issuing the stay, Chief Justice Roberts, writing for three other Justices, indicated that the Supreme Court "is reasonably likely to grant certiorari to resolve the split presented by this case on an important issue of election administration." *Little*, 140 S. Ct. at 2616 (Roberts, C.J., concurring in the grant of stay). The Chief Justice described the question presented in *Little* as "not a case about the right to vote, but about how items are placed on the ballot in the first place. Nothing in the Constitution requires Idaho or any other State to provide for ballot initiatives." *Id.* at 2617. That conclusion stands in stark contrast with our own. *See Schmitt*, 933 F.3d at 639 (holding that *Anderson-Burdick*'s balancing framework, not rational-basis scrutiny, governs how a state organizes its initiative process).

If *Little* is any indicator, the Supreme Court will soon take up the opportunity to resolve the deep circuit split over the framework for measuring challenges to state ballot initiatives. When it does, the Supreme Court would be wise to correct our error.